## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SERRICCHIO, | : | |
| Plaintiff, | : | |
| | : | |
| V. | : | NO.    3:05cv1761 (JBA) |
| | : | |
| WACHOVIA SECURITIES, LLC | : | |
| | : | |
| Defendant. | : | SEPTEMBER 18, 2008 |

## PLAINTIFF'S TRIAL MEMORANDUM
## RE: EQUITABLE RELIEF

### I.    Introduction

On June 18, 2008, the jury returned a Verdict at the liability phase of trial of this action

finding that defendant Wachovia Securities, LLC ("Wachovia") violated plaintiff Michael Serricchio's

rights under the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et*

*seq.* ("USERRA,"), in three respects:

(1) by failing to promptly reinstate him to his position as a Financial Advisor upon his

post-military duty request for reinstatement;

(2) by failing, when it finally did offer to reinstate him, to offer him re-employment to a

position of appropriate status and pay; and

(3) by constructively discharging him.

This action is now scheduled for trial to the Court on October 2-3, 2008 for determination of

the equitable remedies to be afforded Mr. Serricchio for his past and future losses and for a ruling on

the issue of willfulness.  Mr. Serricchio submits this Trial Memorandum to set forth his factual and

legal claims with respect to these issues.

## II.    Mr. Serricchio's Claims for Equitable Relief

Mr. Serricchio seeks the following equitable relief at the second phase of trial:

1. An award, pursuant to 38 U.S.C. § 4323 (d)(1)(B), to compensate him for his loss of wages and benefits ("back pay") from December 18, 2003 (the date the jury found that Wachovia should have reinstated him) to date;

2. An award of liquidated damages, pursuant to 38 U.S.C. § 4323 (d)(1)(C), equal to the back pay award (including prejudgment interest) for Wachovia's willful violations of USERRA;

3. An order of reinstatement, pursuant to 38 U.S.C. §§ 4323( d)(1)(A) & (E), with appropriate compensation, job responsibility and status, and restoration of seniority, or – if reinstatement is not deemed feasible – an award of front pay;

4. An award, pursuant to 38 U.S.C. § 4323(h)(2), of plaintiff's attorneys' fees, expert witness fees and other litigation costs.

Plaintiff notes that where, as here, an employee seeks orders of equitable relief following a jury trial on liability on a federal employment claim, the court is bound by the jury's findings on the issues of the defendant's liability for violating federal employment law. Sorlucco v. N.Y.C. Police Dept., 971 F.2d 864, 873-74 (2d Cir. 1992) ("when a jury has decided a factual issue, its determination has the effect of precluding the court from deciding the same fact issue a different way"); Wade v. Orange County Sheriff's Office, 844 F.2d 951, 954 (2d Cir. 1988) (same).

### A.    Mr. Serricchio is Entitled to an Award of Back Pay, Including Prejudgment Interest, from December 18, 2003 to Date.

As a result of Wachovia's violations of USERRA, Mr. Serricchio is entitled to be compensated for his loss of wages and benefits ("back pay") resulting from Wachovia's violations of his rights under

USERRA. Duarte v. Agilent Techs., Inc., 366 F.Supp.2d 1039, 1049 (D. Colo. 2005) (employee awarded back pay as a result of USERRA violation); Fink v. City of New York,129 F.Supp.2d 511, 514 (E.D.N.Y. 2001) (same); 38 U.S.C. § 4323 (d)(1)(B).[1]

The purpose of a back pay award under USERAA is to make returning service members whole for losses they have suffered as a result of violations of the Act. Novak v. MacKintosh, 1996 WL 677104, at *4 (S.D. Dak. Sep. 9, 1996); Hanna v. American Motors Corp., 724 F.2d 1300, 1311 (7th Cir. 1984) (same under predecessor Veteran's Reemployment Rights Act ["VRRA"]). Courts have recognized that make-whole relief requires not only an award of the service member's actual losses, but prejudgment interest as well. Id.; accord Reopell v. Massachusetts, 936 F.2d 12, 16 (1st Cir. 1996).

Here, the jury concluded that Wachovia should have reinstated Mr. Serricchio to a proper position under USERRA by December 18, 2003. Accordingly, the back-pay period runs from December 18, 2003 through the date of the Court's entry of judgment in this matter. E.E.O.C. v. Joint Apprenticeship Committee of Joint Industry Bd. of Elec. Industry, 164 F.3d 89, 100 (2d Cir. 1998) ("An applicant denied employment in violation of Title VII is ordinarily entitled to an award of back pay from the date of the discriminatory action to the date of judgment").

1.  **Lost Commissions**

The principal component of Mr. Serricchio's back pay losses is his lost commission earnings. For the twelve month period prior to his September 30, 2001 activation, Mr. Serricchio's accounts

---

[1] 38 U.S.C. § 4323(d)(1)(B) provides

The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.

generated $182,298 in gross commissions, producing net commission earnings of $75,687.[2] During the first nine months of 2001, his average monthly net commission earnings were approximately $6,500. [See Pl. Ex. 88].

Under USERRA, a returning service member is entitled to be reinstated as if he had never left, accounting for and crediting the employee with the reasonably certain "pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service have inured to the position but for his absence." Serricchio v. Wachovia Securities, LLC, 556 F. Supp. 2d 99, 106 (D. Conn. 2008) (quoting 20 C.F.R. §§ 1002.191-193); Nichols v. Department of Veterans Affairs, 11 F.3d 160, 163 (C.A. Fed. 1993) (Congress intended that the veteran be treated as if he had never left).[3]

Thus, in determining Mr. Serricchio's lost commission earnings from December 2003 to date, it is necessary to consider not only his pre-activation commission earnings, but also the commissions he would have been able to earn had he been properly reinstated in December 2003 as if he had never left for active duty.

It is plaintiff's understanding, based on the parties' respective expert disclosures, that at trial, both plaintiff's retained expert (Dr. Jonathan Cunitz) and Wachovia's retained expert (Mr. Paul Marcus) will testify that the most reliable method to calculate Mr. Serricchio's lost commissions for each year in the back pay period is by multiplying (i) the projected amount of year-end assets under

---

[2] For the last three months of 2000, Mr. Serricchio generated $43,867.22 in gross commissions and $17,912.08 in net commissions. [Pl. Ex. 90 (PSI 150)]. For the first nine months of 2001, Mr. Serricchio's gross commissions totaled $138,430.99 and his net commission earnings for the period totaled $57,900.06. [Id. (PSI 00163)].

[3] See 38 U.S.C. § 4313(a)(2)(A) (USERRA obligates employers to reinstate the returning veteran to "the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay").

management ("AUM") Mr. Serricchio would likely have had by (ii) the anticipated return on assets ("ROA"), and (iii) multiplying the resulting amount – the gross commissions that Wachovia would have received – by Mr. Serricchio's 40% commission rate.

### a. Determination of Anticipated Growth in Assets under Management

The evidence at trial, produced by Wachovia, demonstrated that as of month-end September 2001, Mr. Serricchio had $4,175,047 in AUM.[4] At trial, Wachovia offered evidence to establish the likely growth in Mr. Serricchio's AUM from 2001 to date.

Specifically, Craig Watson, Prudential's Stamford Branch Manager in 2001-02 (and current Wachovia employee), testified, on behalf of Wachovia, that a successful Financial Advisor *trainee* was expected to generate $500,000 - $1,000,000 per *month* in new assets under management.

> Q. And when you take on a trainee in the Stamford branch, okay, what would you normally – how quickly would you normally expect a trainee to build up assets while they were at the branch?
>
> A. The firm's minimums were about half a million a month. I would tell them that anybody that's really going to make it is closer to a 1 million a month.

[Trial Testimony of Craig Watson, June 13, 2008, at 639:19-640:1 (attached as Exhibit A)].

Watson testified that Mr. Serricchio, as an experienced Financial Advisor with more advanced skills than a trainee, would be expected to gather assets at a faster rate than that of a trainee:

> Q. Do experienced FAs, are they able to build up, gather assets and build up their book of business faster than trainees?
>
> .... [objection omitted]
>
> A. They do better. [Id. at 641:16-23].
>
> Q. And you dealt with Mike Serricchio before he went on leave, did you not?

---

[4] *See* Def. Ex. MMM (PSI 062).

A.    Sure.

Q.    And did Mike Serricchio, was his skills and experience greater than a trainee?

A.    Yes.    [Id. at 642:11-17].

Notably, Wachovia produced this evidence – over Mr. Serricchio's objection – in support of its position that the terms of its March 31, 2004 offer of reinstatement (which provided Mr. Serricchio with virtually no active accounts or likely commission earnings) were reasonable because Mr. Serricchio would have been able to generate over $1 million in commission-producing assets per month upon his return, thereby reaching his pre-activation level of accounts within a matter of months. Mr. Watson was the manager in charge of the branch office in 2001-02 and, according to his testimony, has remained active in retail brokerage management to date. Mr. Watson's testimony was plainly offered by Wachovia as a knowledgeable witness with experience on this issue, and the Court allowed his testimony on that basis. Mr. Watson is a current management-level employee of Wachovia, and his testimony on this point is thus a party-admission on the issue of Mr. Serricchio's likely AUM growth rate. F.R.E. 801(d)(2)(D).

Because Mr. Watson's testimony was offered by Wachovia as evidence of Mr. Serricchio's anticipated AUM growth rate, plaintiff's expert, Dr. Cunitz, has relied on this evidence in determining Mr. Serricchio's likely AUM growth rate had he never left Prudential for active duty and/or been reinstated to his employment in December 2003 as if he had never left.

More specifically, Dr. Cunitz projected Mr. Serricchio's anticipated growth rate based on a *conservative* model of Watson's testimony. Thus, while Mr. Watson asserted that Mr. Serricchio was likely to generate in *excess* of a $1 million in new monthly AUM, Dr. Cunitz limited Mr. Serricchio's growth rate to $1 million per month. In addition, although Mr. Serricchio would presumably be more

experienced and more able to generate greater amounts of AUM as his career progressed, Dr. Cunitz did not increase Mr. Serricchio's projected rate of monthly generation of new assets over the ensuing years of Mr. Serricchio's career,

Dr. Cunitz calculated Mr. Serricchio's likely estimated loss by starting with Mr. Serricchio's asset base in September 2001 of $4,175,047 and adding to that base $1 million in new assets for each month in the back pay period (December 18, 2003 - October 31, 2008). Based on this conservative application of Watson's testimony, Dr. Cunitz has determined that Mr. Serricchio would have had an asset base of approximately $30.7 million as of December 18, 2003.

It should be noted that projecting Mr. Serricchio with an asset base of $30.7 million as of December 2003 would still leave him with *less* than the average amount of AUM for Financial Advisors in Prudential's Stamford Branch Office. As Watson testified:

> Q.    What was the average assets under management for an FA when you were the branch manager?
>
> A.    35, 40 million. [Id. at 624:1-4].

Especially since Prudential recruited Mr. Serricchio in 1999 and paid him over $229,000 in a signing bonus in recognition of his potential to produce new business for the company, Dr. Cunitz's determination that after four years of employment, Mr. Serricchio would still be below the branch average is plainly a conservative estimate of Mr. Serricchio's likely AUM.

### b.  Calculation of Mr. Serriccio's anticipated ROA

Mr. Serricchio's annualized return on assets under management establishes the gross commissions he would generate for the firm. Mr. Serricchio's individualized commission rate of 40% (as provided in his Employment Agreement) establishes the net commission earnings he would be

entitled to receive on the gross commissions generated.

Based on his review of Prudential monthly productivity reports, Dr. Cunitz has been able to calculate Mr. Serricchio's *actual* ROA at Prudential prior to his activation. These records establish that Mr. Serricchio's annualized ROA for the ten month period prior to his activation was 3.73%.[5]

Mr. Serricchio's 3.73% ROA was significantly higher than the average ROA in the Stamford Office. At trial, Watson testified that the average 12-month gross commission per FA in the branch was about $400,000:

> Q. And what was the average 12-month gross commission for a single FA in the branch?
>
> A. About 400,000. [Id. at 624:13-15].

The $400,000 translates to an average ROA on $35-40 million of assets of 1.07%. In addition, Prudential records establish that the ROA for the top quintile performers in the office – those with the largest asset bases – was approximately .9% for in the first half of 2003. This evidence suggests – and the parties' experts agree in their respective reports – that Mr. Serricchio's likely ROA would decrease as the amount of his AUM increased to top quintile levels.

In his original report, dated October 5, 2007, Marcus ignored Mr. Serricchio's actual ROA at Prudential and stated that he believed the most reliable estimate of Mr. Serricchio's ROA for the back

---

[5] In calculating Mr. Serricchio's ROA during his tenure at Prudential, Dr. Cunitz used the ten month period from November 2000 through August 2001. Dr. Cunitz excluded Mr. Serricchio's ROA from October 2000 from his calculation, considering October 2000 to be an atypical month because Mr. Serricchio was not permitted to solicit his former clients during that month and that was his first month of employment at Prudential. Dr. Cunitz also treated September 2001 as an aberrant month due to the markets closing in response to the September 11, 2001 terrorist attacks. It should be noted that Def. Ex. MMM establishes that Mr. Serricchio's actual ROA for 2000 was 4.8% and his actual ROA for all of 2001 (through September 30, 2001) was 4.31%. As such, Dr. Cunitz's exclusion of these months in calculating Mr. Serricchio's ROA during his tenure at Prudential produced a lower (e.g. more conservative) ROA than if he had included said months in his calculations.

pay period was 2.03%. Mr. Marcus asserted that the 2.03% was the appropriate ROA because that was Mr. Serricchio's ROA at Morgan Stanley as of October 2000, when he was hired by Prudential.[6]

Dr. Cunitz has accepted that ROA (rather than Mr. Serricchio's higher, actual ROA at Prudential) as a conservative projection of Mr. Serricchio's likely ROA prior to reaching top quintile levels. In his calculations, Dr. Cunitz further reduced Mr. Serricchio's projected ROA as the amount of his AUM increased. In particular, once Mr. Serricchio reached $35 million in projected AUM, Dr. Cunitz utilized an ROA of 0.9%, the ROA for the top quintile performers in the branch with approximately the same amount of assets. Accordingly, it is clear that Dr. Cunitz's overall ROA is significantly more conservative than the ROA utilized by Marcus in his original report.[7]

Based on these projections, Dr. Cunitz has calculated Mr. Serricchio's lost commission earnings for the back pay period (from December 18, 2003 through October 31, 2008), as follows:

| | |
|---|---|
| 2003 (from 12/18) | $ 6,494 |
| 2004 | $155,131 |
| 2005 | $172,604 |
| 2006 | $214,724 |
| 2007 | $256,844 |
| 2008 (10 mos) | $246,212 |
| Total Lost Commissions: | $1,052,009. |

### 2. *Fringe Benefits.*

USERRA expressly provides for recovery of benefits lost as a result of an employer's violations of the Act. 38 U.S.C. § 4323(d)(1)(B). Had Mr. Serricchio been employed by Wachovia during the back pay period, he would have been entitled to receive fringe benefits. Dr. Cunitz has calculated Mr.

---

[6] The 2.03% represents Mr. Serricchio's ROA at Morgan Stanley for <u>one</u> month of his employment at Morgan Stanley.

[7] In his original report, Mr. Marcus started with a 2.03% ROA in 2004, held it constant through 2018, and then reduced it gradually to 1.18% by 2035.

Serricchio's loss of fringe benefits at 15% of Mr. Serricchio's net commission earnings based on the low end of the range for data on benefits published by the U.S. Department of Labor. In addition, because these benefits are non-taxable, Dr. Cunitz will further testify that it is appropriate to apply a 4.1% after-tax discount rate to establish the actual value of the lost benefits to Mr. Serricchio. Dr. Cunitz has calculated the value of Mr. Serricchio's lost benefits during the back pay period at $157,801.

### 3. *Deferred Bonus*

Pursuant to Mr. Serricchio's Employment Agreement (Pl. Ex. 9), he was entitled to receive a deferred compensation bonus of $65,595, which was scheduled to vest in October 2005. Mr. Serricchio seeks to recover that amount as part of his back pay losses, and Dr. Cunitz has included that amount in his calculations.

### 4. *Prejudgment Interest*

Mr. Serricchio further seeks to recover prejudgment interest on his total back pay losses to compensate for the delay in payment over the past nearly five years. An award of prejudgment interest is necessary under § 4323(d)(1)(B) to effectuate the statutory goal of compensating Mr. Serricchio for his losses resulting from Wachovia's violations of USERRA. Novak v. MacKintosh, 1996 WL 677104, at *4 (awarding prejudgment interest to effectuate USERRA's make-whole goal); Reopell v. Massachusetts, 936 F.2d at 16 (same under predecessor VRRA statute); Hanna v. American Motors Corp., 724 F.2d at 1311-12 (same).

As the First Circuit held in Reopell, the statutory language of VRRA's back pay provision

> empowers the court to require an employer ... 'to *compensate* [the injured employee] for any loss of wages or benefits suffered by reason of such employer's unlawful action."

> 38 U.S.C. § 2022 (emphasis supplied).  To fully compensate for past-due wages would seem to require awarding interest.

936 F.2d at 16.  Significantly, the text of USERRA's back pay provision, 38 U.S.C. § 4323(d)(1)(B), contains this same command to "require the employer to *compensate* the person for any loss of wages or benefits suffered by reason of such employer's failure to comply [with USERRA]."

"Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." Id.  "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss," and the Supreme Court has "repeatedly stated that prejudgment interest 'is an element of [plaintiff's] complete compensation.'" Id. (quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 175 (1989) (citation omitted).

An award of prejudgment interest is included as a necessary component of the back pay award in a federal employment case "to prevent an employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages." Clarke v. Frank, 960 F.2d 1146, 1154 (2d Cir. 1992). The Second Circuit has repeatedly held that when the damages awarded to a plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion not to include prejudgment interest." Sharkey v. Lasmo, 214 F.3d 371, 375 (2d Cir. 2000) (Denial of prejudgment interest on employee's lost wages was not justified in ADEA action by facts that jury's award was generous, that employee had made only desultory efforts to mitigate his damages, and that he had received considerable settlement of his severance claims); Clarke, 960 F.2d at 1154 (ordinarily an abuse of discretion not to award prejudgment interest in a Title VII action); Donovan v. Sovereign Security, Ltd., 726 F.2d 55, 58 (2d Cir. 1984) (same under FLSA); EEOC v. County of Erie, 751 F.2d 79, 81

(2nd Cir. 1984) (same under EPA); <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 873 (2d Cir. 1998) (same under §1983 action).

Where prejudgment interest is awarded, it is in the court's discretion to determine the appropriate rate. <u>See</u> <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 56 (2d Cir. 1998) ("It is within the trial court's broad discretion to elect whether and how to compute pre-judgment interest"). Plaintiff seeks an award of prejudgment interest at the Connecticut statutory rate of 10% per annum established pursuant to Conn. Gen. Stats. § 37-3a. <u>See</u> <u>Persky v. Cendant Corp.</u>, 547 F.Supp.2d 152, 165 n. 11 (D. Conn. 2008) (awarding prejudgment interest in FMLA case using the Connecticut statutory interest rate of 10 percent, citing Conn. Gen. Stats. § 37-3a); <u>Palma v. Pharmedica</u>, 2003 WL 22750600, *2 n.4 (D. Conn. September 30, 2003) (Fitzsimmons, Mag. J.) (same). At this rate, the prejudgment interest on Mr. Serricchio's lost commission earnings, fringe benefits and deferred bonus totals $275,200.

Attached as Exhibit B to this Memorandum is Cunitz Exhibit A2, which is a table setting forth Mr. Serricchio's projected lost commissions, lost benefits, lost bonus and prejudgment interest through October 31, 2008. This table demonstrates total back pay losses of $1,550,605.

### 5.   Mr. Serricchio's Earnings in Mitigation

In order to determine the proper amount of the back pay award, Wachovia is entitled to an offset of Mr. Serricchio's mitigation earnings – that is, the amount of money Mr. Serricchio earned during the back pay period.

Mr. Serricchio applied for reinstatement on December 1, 2003. While waiting for Wachovia's response to his request for reinstatement, Mr. Serricchio assisted his wife in the tanning salon business she started in 2003. When Wachovia failed to properly reinstate him, Mr. Serricchio remained in the tanning salon business and has continued to work in the tanning salon business to date. As Mr.

Serricchio testified at trial, he has worked six-seven days per week, 16 hours per day, in the tanning salon business from 2003 to date.

The Serricchios' tanning salon business was, for much of this time frame, a start-up business that required an initial large capital investment as well as a continuing infusion of capital investments to stay afloat. Mr. Serricchio has not been able to generate meaningful compensation from the business to date. Nonetheless, Mr. Serricchio anticipates generating profits beginning this year, with such profits gradually increasing over time.

Dr. Cunitz has calculated Mr. Serricchio's mitigation earnings from the tanning salon business based on two alternative models. In the first model, Dr. Cunitz calculated Mr. Serricciho's earnings based on a cash flow analysis of the business, which Dr. Cunitz believes is the most appropriate way to measure Mr. Serricchio's earnings from the tanning salon business. This model considers the net cash flow income to Mr. Serricchio in light of the significant capital investments that were required to open and build out tanning salons and the profits that the salons generated. As Dr. Cunitz will explain at trial, the large capital investments resulted in higher than normal depreciation in the starting years of the business, thereby reducing net income. The capital investments were funded by Mr. and Mrs. Serricchio's savings, combined with the initial cash generated by the salons (income before depreciation). Dr. Cunitz will testify that it is the net cash flow to the owner that is the most significant measure of income because it reflects the amount of income the owner actually has to sustain himself. In Dr. Cunitz's opinion, the cash flow model is more accurate than simply relying on the annual income reported to the Internal Revenue Service since the reported amounts are simply a recovery of the Serricchios' investments in the business and, in that sense, constitute phantom income.

Under the cash flow model, Dr. Cunitz analyzed the Serricchios' total capital investments in the tanning salons and subtracted the cash income they received. Mr. and Mrs. Serricchio invested $443,226 in the tanning salons from 2003-2007, and received cash income of $395,976. As such, the Serricchios have yet to recover their investments in the tanning salons. Based on the cash flow model, Dr. Cunitz calculates that Mr. Serricchio has had minimal earnings ($533 in 1099 services for a third party).

Alternatively, Dr. Cunitz calculated Mr. Serricchio's past earnings based on Mr. and Mrs. Serricchio's annual taxable earnings from the tanning salon business, as reported to the Internal Revenue Services, for each period in the back-pay period. These earnings are set forth on the attached Exhibit C (Cunitz Exhibit A3) and, when adjusted for prejudgment interest, total $153,262.[8]

It is, thus, Dr. Cunitz's opinion that Mr. Serricchio's losses for the back-pay period are $1,397,343 - $1,550,072, depending on which measurement of Mr. Serricchio's mitigation earning is utilized. As noted above, it is Dr. Cunitz's professional opinion that the cash flow model more accurately reflects Mr. Serricchio's actual income from the tanning salon business, producing the $1,550,072 in total losses. Attached as Exhibit D (Cunitz Exhibit A1) is a schedule showing Dr. Cunitz's calculations of Mr. Serricchio's back pay losses, adjusted for mitigation earnings, and with prejudgment interest calculated to October 31, 2008.

---

[8] Although the Serricchios own the tanning salon business together, Dr. Cunitz – at plaintiff's counsel's instruction – did not attempt to allocate the Serricchios' earnings between Mr. and Mrs. Serricchio, thus giving Wachovia full credit for all reported earnings from the business.

**C.** **Plaintiff is Entitled to an Award of Liquidated Damages for Wachovia's Willful Violations of USERRA.**

1. The Applicable Standard

Pursuant to 38 U.S.C. § 4323 (d)(1)(C), where the court determines that an employer's violation of USERRA is willful, the court may award liquidated damages equal to the amount awarded to compensate the plaintiff for loss of wages or benefits.[9] The purpose of the provision is punitive – to impose a cost on employers who willfully violate the Act to deter future misconduct. Fink, 129 F.Supp.2d at 523.

This liquidated damages provision – which was not included in predecessor veterans' reemployment rights statutes – was added by Congress in its 1994 enactment of USERRA "in an obvious effort to strengthen the rights of service men and women." Maher v. City of Chicago, 463 F. Supp.2d 837, 840-41 (N.D. Ill. 2006); accord McLaughlin v. Newark Paperboard Products, 2007 WL 81059, *2 (W.D. Pa. Jan. 8, 2007) ("USERRA was enacted to further strengthen veterans' reemployment rights and one of the additional protections not available under predecessor statutes was

---

[9] The remedy for a willful violation is set forth in a combination of two subsections of the remedies provisions of the Act. Section 4323(d)(1)(C) provides:

> The court may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful.

Subsection 4323(d)(1)(B), the section referenced in §1(C) provides that

> The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.

Thus, read in tandem, the Act provides for an award of liquidated damages equal to the amount awarded in total compensation for an injured plaintiff's economic losses.

the right to seek liquidated damages"); see Gummo v. Vill. of Depew, 75 F.3d 98, 105 (2d Cir. 1996) (in enacting USERRA, Congress intended to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions.").

While the statute does not define 'willful,' courts that have addressed this issue have interpreted the term consistent with the Supreme Court's interpretation of 'willful' under 29 U.S.C. § 626(b), the liquidated damages provision of the Age Discrimination in Employment Act ("ADEA"). Maher at 841 ("there is no principled distinction between the ADEA's double damage remedy and that in USERRA"); Duarte, 366 F.Supp.2d at 1049 (same); Fink at 523 (same).

Under the ADEA standard, an employee need not establish the employer's specific intent to violate the Act in order to prove willfulness; rather an employer's actions are deemed willful when the employer "either knew or showed reckless disregard for the matter of whether that its conduct was prohibited by law." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985); accord Hazen Paper Co. v. Biggins, 507 U.S. 604, 614 (affirming Thurston); Cross v. New York City Transit Authority, 417 F.3d 241, 252 (2d Cir. 2005) ("Well-established precedent recognizes that the willfulness necessary to support liquidated damages under the ADEA can be established either by proof that a defendant actually knew that his conduct violated federal law or by reckless disregard of that fact"). Courts imposing liquidated damages under USERRA have followed this standard. See e.g., Fink at 523; see Cross at 254 (citing Fink and noting similar application of liquidated damages provisions in ADEA and USERRA).

Thus, a USERRA plaintiff can establish willfulness in two ways – first, by proving that the employer had actual knowledge that its conduct was violative of USERRA; and second, by proving that an employer acted with reckless disregard of whether its conduct was violative of USERRA.

16

Thurston at 125; Cross at 253; Fink at 523. As the court held in Fink, an employer acts with reckless disregard when it "wholly disregards the law ... without making any reasonable effort to determine whether [its actions] would constitute a violation of the law." Fink at 523 (quoting Thurston at 125).

In addition, a court can infer willfulness from an employer's false justifications for its conduct. See, e.g., Cross at 253 (creation of a calculated subterfuge to support an adverse employment action supports an inference that the employer knew or recklessly ignored the fact that their real reason for demoting the plaintiffs--age--was unlawful"); Kirsch v. Fleet St., Ltd., 148 F.3d 149, 164-65 (2d Cir. 1998) (upholding jury verdict on willfulness under the ADEA because "[t]he jury permissibly found that [defendant] intentionally discharged [plaintiff] because of his age and that defendants sought to conceal their age-based motivation by proffering a pretextual rationale of corporate financial exigency"); Benjamin v. United Merchs. & Mfrs., Inc., 873 F.2d 41, 44-45 (2d Cir.1989) (finding that jury can infer a willful violation of the ADEA where employer proffered false and shifting justifications for unlawful termination "calculated to conceal deliberate age discrimination;" entitling jury to conclude that the employer "knew the law but at the same time attempted to evade it").

Where liquidated damages are awarded, a plaintiff is entitled to recover an amount equal to the full amount recovered to compensate him for his loss of wages and benefits. As discussed above, that amount includes the actual losses to date and prejudgment interest. Novak v. MacKintosh, 1996 WL 677104, at *4; Reopell v. Massachusetts, 936 F.2d at 16 (same under VRRA); see Persky v. Cendant Corp., 547 F. Supp. 2d at 165 (liquidated damages award in FLSA case "includes the economic damages suffered by Plaintiff, as well as ... prejudgment interest, as calculated ... using the Connecticut statutory interest rate of 10 percent); Palma, 2003 WL 22750600, at *2 n.4 (analyzing relevant case law and noting that with the exception of one case, federal statutory liquidated damages awards are "in

the exact amount of the back pay and prejudgment interest awarded by the court or jury, as mandated by statute").

### 2.   Wachovia's Violations of the Act Were Willful

While Mr. Serricchio would be entitled to liquidated damages if any one of Wachovia's violations of USERRA was willful, Mr. Serricchio submits that the evidence compels a finding that each of the three violations of USERRA found by the jury was willful.

#### a.    Wachovia Willfully Violated USERRA's Prompt Reinstatement Requirement.

The statutory language of USERRA contains a clear-cut command that returning veterans entitled to reemployment under the Act "shall be promptly reemployed." 38 U.S.C. §4313(a). This provision of USERRA is designed to provide returning veterans with the fundamental protection of insuring that they will not be not left without the financial means to immediately support themselves and their families upon their discharge from active duty.[10]

The jury found that Wachovia – which waited nearly four months before offering Mr. Serricchio reemployment – violated this statutory command. Wachovia's delay was willful, under either the "actual knowledge" or "reckless disregard" standard.

At trial, Nancy Gibbons, the Employee Relations Manager with responsibility for implementing Wachovia's military leave policy and Wachovia's Rule 30(b)(6) designee on Wachovia's policy in this action, testified that Wachovia was aware of USERRA and that under USERRA, Mr. Serricchio had a

_____

[10] See 38 U.S.C. 4301(a) (purpose of prompt reinstatement is "to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service"). USERRA's implementing regulations provide that "absent unusual circumstances," re-employment must occur within two weeks of the employer's receipt of the returning veteran's request for reinstatement. See 20 C.F.R. 1002.181.

right to be promptly reinstated:

> Q. ...Now, did you understand, as the designee of Wachovia on its military leave policy, did you understand that returning veterans had certain rights under the Uniformed Services and Reemployment Rights Act?
>
> A. Yes, sir.
>
> ....
>
> Q. Did you know at that time frame that USERRA required -- and I'm only asking your understanding now — did you have an understanding of whether there was any requirement that a returning veteran be promptly reinstated?
>
> A. Yes .
>
> ....
>
> Q. And you knew, at the time he was seeking reemployment, that Wachovia had an obligation to reinstate him promptly, correct?
>
> A. Correct. [Gibbons Trial Tr. at 392:8-393:2, 395:12-15 (attached as Exhibit E)].

Despite Wachovia's *actual knowledge* of its obligation under USERRA to reinstate Mr.

Serricchio promptly, Wachovia did not do so. The evidence in this case has established that :

> – Mr. Serricchio's December 1, 2003 letter (from counsel) to Mr. Serricchio's branch manager Lawrence Meyers requesting reinstatement was received at Wachovia's Westport branch by December 4, 2003. [Pl. Ex. 39].
>
> – Meyers understood from the letter that Mr. Serricchio was seeking reemployment. Meyers further understood that Mr. Serricchio was entitled to reemployment at that time. [Meyers, Trial Tr. at 739:22-740:2] (attached as Exhibit F)].
>
> – Mr. Serricchio had met with Meyers in April 2003 and advised Meyers that he was scheduled to be released from active duty in the Fall of 2003 and would be seeking reemployment at that time. Meyers thus was aware for over seven months prior to receiving the December 1 letter that Mr. Serricchio wanted and would be seeking reinstatement. [Pl. Ex. 37 (April 24, 2003, Meyers Date Book, stating that Mr. Serricchio expects to complete his service by the end of the year)].

– According to Meyers, in December 2003. there were no operational impediments to immediately reinstating Mr. Serricchio. He was ready to reinstate Mr. Serricchio as soon as he was authorized to do so by Wachovia Employee Relations and instructed as to the terms of Mr. Serricchio's reinstatement. [Meyers, Trial Tr. at 744:10-745:21] (attached as Exhibit F).

– The Westport branch forwarded the December 1, 2003 letter to Wachovia Employee Relations by facsimile transmission on December 4, 2003. [Pl. Ex. 40].

– The December 1, 2003 letter was forwarded to Ms. Gibbons on December 22, 2003 [Pl. Ex. 50] and reviewed by Ms. Gibbons by the first week in January. [Gibbons, Trial Tr. at 390:12-19 ] (attached as Exhibit E).

- Mr. Serricchio was not offered reinstatement until March 31, 2004, nearly four months after the letter was received. [See Pl. Ex. 47].

– According to Gibbons, the terms of reinstatement offered to Mr. Serricchio on March 31, 2004 were nothing more than straightforward application of Wachovia's military leave policy, was in effect in December 2003 when Mr. Serricchio's request for reinstatement was received, and could have been presented to him "on day one." [Gibbons, Trial Tr. 439:4-8; 435:6-10] (attached as Exhibit E).

Despite the significant factual evidence establishing Wachovia's actual knowledge of

USERRA's prompt reinstatement requirement, and the requirement's application to Mr. Serricchio,

Wachovia – both prior to and during trial – either directly or indirectly asserted a litany of false and/or

disingenuous justifications for its unlawful conduct.

Specifically, prior to trial, in its Memorandum in support of its motion for summary judgment,

Wachovia *argued* that it did not consider Mr. Serricchio's December 1, 2003 letter a request for

reinstatement. This *argument* was unsupported by any evidence from any Wachovia witness. In fact,

Wachovia's *argument* was expressly contradicted by Meyers, the recipient of the letter.

Meyers, Wachovia's Vice-President and Supervisor in Charge of Wachovia's Westport Branch,

testified that he understood that Mr. Serricchio's December 1, 2003 letter was a request for

reinstatement and understood that Mr. Serricchio had a right to reinstatement:

20

Q. And you understood from that [December 1, 2003] letter that Mr. Serricchio was seeking reinstatement, correct?

A. Correct.

Q. And you believed at that time that Mr. Serricchio was entitled to be reinstated, correct?

A. Yes.

Q. You had no question about that, did you?

A. No. [Meyers, Trial Tr. at 740:2:10] (attached as Exhibit F).

Gibbons, Wachovia's Employee Relations Manager supervising the application of Wachovia's military leave policy to Mr. Serricchio, likewise admitted (albeit grudgingly) that she knew Mr. Serricchio was seeking reemployment and "that Wachovia had an obligation to reinstate him promptly." Thus, after initially denying that Mr. Serricchio had submitted a request for reinsatement, Ms. Gibbons was confronted with and acknowledged her contrary deposition testimony:

Q. Now do you agree that Mr. Serricchio submitted a request for reemployment in his letter of December 1, 2003?

A. No.

Q. Did you testify at your deposition that you understood that Mr. Serricchio had submitted a request for reemployment.

A. I don't remember.

....

Mr. Golub: On page 51, Mr. Ross.

Q. Question: "Were you aware that Mr. Serricchio was seeking reemployment?"
Answer: "Yes, I was made aware of that."
Question: "And how were you made aware of that?"
Answer: "Mr. Rotondo made me aware."

21

Q.   Is that what you testified at your deposition in July of 2007?

A.   Yes, sir.

....

Q.   And can you just answer that "yes" or "no," was it truthful what you said on July 2007?

A.   Yes.

Q.   So when you testified at your deposition, you testified that you were aware that Mr. Serricchio was seeking reemployment, correct?

A.   Yes.

Q.   And you knew, at the time he was seeking reemployment, that Wachovia had an obligation to reinstate him promptly, correct?

A.   Correct.  [Gibbons, Trial Tr. at 394:6-395:15 (emphasis added)] (attached as Exhibit E).

In *argument* to the Court in defense of plaintiff's Motion for a Directed Verdict on the issue of

Wachovia's failure to comply with USERRA's requirement of prompt reinstatement, Wachovia

claimed that the delay in reinstatement was warranted by transition problems occasioned by

Wachovia's purchase of Prudential Securities, LLC in 2003 and the consolidation of the Stamford and

Westport branch offices.  Wachovia presented no evidence in support of this *argument*.  Indeed, the

*evidence* at trial was undisputed that Meyers was in charge of the branch as early as 2002 (as an

employee of Prudential), assisted by Carson Coyle, the Branch Adminstrator (as an employee of

Prudential), and that the branch management and branch personnel remained unchanged after

implementation of the merger.  Significantly, Wachovia did not even assert this purported basis for

delay in argument to the jury.

In argument to the jury, Wachovia clearly sought to take advantage of possible jury dislike for lawyers by suggesting that the delay in reinstating Mr. Serricchio was because his request for reinstatement came through his attorney. But again, there was no evidence to support this argument. In fact, although Gibbons testified that Mr. Serricchio's request for reinstatement did not come through the "normal channels" because it was sent from a lawyer, thus creating "unusual circumstances," [see id. at 421:12-24; 424:1-11; 426:17:24; 428:7-18], when challenged on this assertion, Gibbons quickly retreated, acknowledging that she did not mean to claim that the fact that the letter came from an attorney was any reason why Mr. Serricchio could not be promptly reinstated. [Id. at 426:13-18].

Likewise, although Wachovia argued (on summary judgment) that the December 1, 2003 letter contained a list of grievances that it needed to address before Mr. Serricchio could be reinstated, Gibbons admitted that was not a basis to delay prompt reinstatement:

> Q. ... I take it's your position that none of those things [referring to the list of grievances contained in the December 1, 2003 letter] required any alteration to the standard offer that you say USERRA warranted of putting the FA back with the state-mandated draw and the opportunity to earn commissions, is that correct?
>
> A. I do not believe they should affect his reinstatement, but if there were issues he wanted to work on, we certainly would be open to doing that.
>
> Q. But they didn't need to affect the terms of his reinstatement or the timing of his reinstatement, correct?
>
> A. Not if he was willing to come back and follow the rules to do that. [Id. at 440:6-19].

As Ms. Gibbons subsequently admitted:

> A. Looking at this letter, he should have been able to have been reinstated, and other issues could have been addressed at another time. [Id. at 441:15-17].

Indeed, the evidence at trial was undisputed that Kenneth Rotondo, the Employee Relations

Vice President assigned to investigate Mr. Serricchio's grievances, completed his investigation and submitted his report to Gibbons by December 22, 2003. Even assuming that delay until that time were necessary – an assumption rejected by the jury, which found that Mr. Serricchio was entitled to reinstatement by December 18, 2003 – there was no good faith basis for three months of delay thereafter.

In sum, the evidence at trial established that Wachovia – with actual knowledge of its obligation to reinstate Mr. Serricchio promptly – left him in limbo for nearly four months and presented no evidence to justify that delay. Whether deemed a deliberate breach of its known statutory obligations under the Act[11] or blatant disregard of those known obligations, Wachovia's conduct must be deemed willful, subjecting Wachovia to liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C); see also Cross at 253 (creation of a calculated subterfuge to support an adverse employment action supports an inference that the employer knew or recklessly ignored the fact that their real reason for demoting the plaintiffs--age--was unlawful"); Benjamin v. United Merchs. & Mfrs., Inc., 873 F.2d 41, 44-45 (2d Cir.1989) (finding that jury can infer a willful violation of the ADEA where employer proffered false and shifting justifications for unlawful termination "calculated to conceal deliberate age discrimination");

---

[11] As discussed below, the Court's instructions on constructive discharge required the jury to find that through the terms of its offer of reinstatement, Wachovia deliberately or intentionally created a work situation for Mr. Serricchio so intolerable that he was forced to quit involuntarily. The jury's finding of constructive discharge thus supports the conclusion that Wachovia's breach of its obligation of prompt reinstatement was deliberate.

b. Wachovia Willfully Violated USERRA's Requirement of
Reinstatement to a Position with Appropriate Status and Pay.

Under USERRA, an employer is required to reemploy a returning service member in the position with the same status, and pay the person would have had if his employment had not been interrupted by military service (or to a comparable position of like status and pay). Compliance with this principle is a central feature of the Act's goals of both minimizing the disadvantages of military service as well as rewarding those who serve.[12] The employer's strict adherence to this statutory requirement is mandated, with noncompliance permitted only upon a demonstration by the employer that compliance would be "impossible," "unreasonable" or would cause an "undue hardship." See 38 U.S.C. § 4312(d)(1)(A-B).[13]

The jury found that Wachovia – which offered Mr. Serricchio reinstatement to a Financial Advisor position with virtually no active accounts, no likelihood of commission earnings, and the "opportunity" to recreate his prior successful position through cold-calls – violated this statutory mandate. Wachovia's failure to offer Mr. Serricchio a position with proper status and pay was willful, under either the "actual knowledge" or "reckless disregard" standard.

There is no question that Wachovia had actual knowledge of this fundamental requirement of USERRA. Wachovia's Military Leave Policy (Pl. Ex 73) expressly acknowledges this requirement:

---

[12] In post-trial motions, Wachovia has argued that this principle – the escalator principle – only applies to seniority-based rights and benefits. See Wachovia's July 2, 2008 Memorandum in Support of its Renewed Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial (Dkt. #  ) at 23. Although Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284 (1946), the seminal Supreme Court case discussing the escalator principle, principally involved the issue of a veteran's seniority rights, the escalator principle has been codified in USERRA, see 38 U.S.C. § 4313; 20 C.F.R. § 1002.191, and "applies with equal force to all aspects of the service member's return to the work force." DOL USERRA Regulations, 2005 WL 3451172 at 75270.

[13] At trial, Wachovia expressly disclaimed any reliance on these potential defenses.

25

After you complete military service for no longer than five years and are otherwise qualified, you are eligible for reemployment in the job you would have had if you had not been absent for military service, with the same seniority, pay and benefits.

Pl. Ex. 73 at 4.

Gibbons admitted Wachovia's understanding of this provision and its inclusion in Wachovia's military leave policy:

> Q.   .... Did you understand under USERRA that the employee had a right to be reinstated to the position he would have had if he had never left the military service, left for military service?
>
> ....
>
> A.   Yes, I am aware of that.
>
> Q.   Okay. And, in fact, that particular provision is actually included in Wachovia's military leave policy, correct?
>
> A.   Yes. [Gibbons, Trial Tr. at 395:18-396:10] (attached as Exhibit E).

Gibbons further expressly acknowledged that this provision of USERRA applied to Mr. Serricchio:

> Q.   And he [Mr. Serricchio] would be entitled to reemployment in the job he would have had with the same seniority, pay and benefits, correct?
>
> A.   Yes. [Id. at 397:18-21].

Although Wachovia (through its policy and Gibbons) acknowledged its obligation under USERRA to reemploy Mr. Serricchio in a position with the same status and pay he would have had if he never left, it patently failed to do so.

At the time Mr. Serricchio left for active duty, he was a successful financial advisor, managing over $9 million in assets with his partner (approximately half of which he was personally responsible for), servicing an extensive client base of approximately 250 accounts, and earning approximately

$6,500 per month in net commissions. Mr. Serricchio testified about the nature of his pre-activation responsibilities and activities, including his interactions with his clients, the active and busy nature of his work, and about the importance of his role in advising his clients on their financial issues. All of this evidence established the "status" and "pay" of Mr. Serricchio's position at the time of his activation.

Moreover, as discussed above, at time of Mr. Serricchio's activation, his manager Craig Watson expected that if Mr. Serricchio had not been activated, he would have produced new assets under management of more than $1 million per month. Even assuming – as Wachovia has argued – that Mr. Serrichio might have lost some of his 2001 accounts, he would nonetheless have increased his AUM to over $26 million in the 26 months from October 2001 to December 2003 and by over $30 million by the end of March 2004, when Wachovia finally offered him reinstatement.[14] As a financial advisor with over $25 million in AUM, he would have significant account management responsibilities, substantial financial counseling and other interaction with clients, an active client business and commission earnings (even at an ROA of .9%) of over $100,000 annually.

Wachovia's actual offer of reinstatement in March 2004 – virtually no active accounts generating negligible commissionable earnings, a $2,000 monthly draw and the opportunity to make cold calls to try to develop new business. Indeed, Pl. Ex. 68, a schedule prepared by Wachovia's expert witness showing the actual commissions generated by the accounts potentially included in Wachovia's reinstatement offer to Mr. Serricchio, establishes that the actual gross commissions generated by the accounts in 2004 was negligible and the potential commission earnings for Mr.

---

[14] Wachovia apparently takes the position that had he not been activated, Mr. Serricchio would have been unable to retain virtually all of his accounts and over the 29 month period from October 2001 to April 2004 would not have generated any new AUM.

Serricchio minuscule. In May 2005, the commission earnings would have been approximately $360.00; in June 2004, $4.00; in July 2004, $275.00; in August 2004, $30.00.

Plaintiff submits that no one at Wachovia could have reasonably believed that the position offered Mr. Serricchio – making cold calls to attempt to develop a new book of business – had the same status as the position he left. And no one at Wachovia could have reasonably believed that the position carried the same (let alone increased) compensation Mr. Serricchio would have earned had he not left for military service.

Wachovia has argued that its failure to comply with USERRA's reemployment requirements cannot be deemed willful because there is uncertainty in the law about how commissioned employees are to be treated under the Act. But Wachovia presented no evidence that its reemployment offer was predicated on any consideration of USERRA, the case law interpreting status or pay, *or* the practical impact it would have on reducing Mr. Serricchio's status as an accomplished financial advisor to an advisor in essentially a start over role. In addition, Wachovia did not present any evidence that it attempted to ascertain whether its actions complied with USERRA. Rather, Wachovia's position was that its reemployment offer was a straightforward determination based on its military policy, and that no further investigation was required. [Gibbons, Trial Tr. 435:6-10; 439:4-8] (Exhibit E).

Had Wachovia made a good-faith effort to ascertain whether its policy complied with USERRA's reinstatement requirements regarding "status" it would have certainly and easily discovered the well-established law that returning a veteran into a position with the same title, although different level of responsibilities is a plain violation of USERRA. See Duarte at 1046 (even though title, pay, and benefits were all the same, employer violated USERRA by reinstating veteran into a position with diminished responsibilities); Harris v. City of Montgomery, 322 F. Supp. 2d 1319, 1323

28

(M.D. Ala. 2004) (although veteran retained same official title, employer violated USERRA because, in reality, veteran had diminished status and responsibilities); Nichols v. Department of Veterans Affairs, 11 F.3d 160, 163 (C.A. Fed. 1993) (employer unlawfully transferred reinstated veteran from a position in which he had "clearly understood responsibility and objectives and was familiar with the criteria by which his success was to be judged ... [to a new position that] lacks any such predictability, and success, or what will be perceived as success").

Moreover, had Wachovia researched whether its reinstatement offer complied with USERRA cases considering commissioned-based veterans' pay entitlement, it would have discovered veterans rights cases involving commissioned-based employees that demonstrate that Wachovia's offer of a $2,000 draw while Mr. Serricchio attempted to rebuild a book of business that previously generated over $70,000 in net commission earnings was plainly insufficient. See Trusteed Funds v. Dacey, 160 F.2d 413, 418 (1st Cir. 1947) (returning a veteran into a commission-based position and requiring him "to start from scratch," "recruit[] a sales force, and build[] up the business" is not a proper form of reinstatement); Major v. Phillips-Jones Corp., 192 F.2d 186, 188-89 (2d Cir. 1951) (employer complies with veteran reemployment requirements of Selective Training and Service Act by offering returning veteran-commissioned salesman alternative, but more lucrative route, than he had at time of activation); Schweitzer v. Midwest Dairy Products Corporation, 174 F.2d 612, 613 (7th Cir. 1949) (employer complies with veteran reemployment requirements of Selective Training and Service Act by offering returning veteran-commissioned salesman alternative route with "comparable opportunities as to seniority, status and pay" to route veteran had at time of activation); Loeb v. Kivo, 169 F.2d 346, 351 (2d Cir. 1948) (where change in floral business eliminated the need for outside salesmen, employer required to reemploy returning veteran who had been outside commissioned salesman in inside

29

position at *salary* paid to the employee performing inside job that should have been given to returning veteran).

And finally, in assessing Wachovia's conduct, it is important to note Wachovia's claim at trial that the term "pay" when used in its military leave policy in reference to its obligations to reinstate a commissioned Financial Advisor, means "zero," while the same term, "pay," when used in the policy in reference to payments to commissioned Financial Advisors while they are on active duty means commissioned-based earnings. [Gibbons, Trial Tr. at 401:1-416:4 (Exhibit E)]. Gibbons could not provide *any* explanation for Wachovia's disparate interpretation of the term "pay" in its policy. [Id.].

In sum, Wachovia had admitted knowledge of its obligation to reemploy Mr. Serricchio at the status and pay he would have had if he had never for military service. Wachovia's offer of reinstatement fundamentally failed to comply with obligation as to either status or pay. Neither common sense, the case law or Wachovia's own military leave policy supports Wachovia's claimed interpretation of its responsibilities under the Act. Wachovia acted with either actual knowledge that its offer did not comply with USERRA or in reckless disregard of its obligation to comply but failing to take adequate (let alone any) steps to ascertain whether its conduct was lawful. Accordingly, this Court should find that Wachovia's conduct was willful, and that it is properly held liable for liquidated damages. See Fink, 129 F. Supp .2d 511 at 523; see also Persky v. Cendant Corp., 547 F. Supp. 2d 152 (D. Conn. 2008) (employer's failure to take adequate steps to confirm plaintiff's pre-maternity duties and responsibility in determining its reemploymnet obligations under FMLA was reckless, despite employer's consulting with counsel); Brock v. Wilamowsky, 833 F.2d 11, 18-19 (2d Cir. 1987) (absent "taking any steps whatever to determine the lawfulness of its conduct [employer] had no good-faith or reasonable basis for believing its conduct was lawful"); Herman v. RSR Sec. Services Ltd., 172 F.3d

132 (2d Cir. 1999) (recklessness found where employer had "extensive knowledge of the FLSA's requirements, but utterly failed to take the steps necessary to ensure [company's] pay practices complied with the Act"); compare Thurston, 469 U.S. at 129 (employer did not ack with reckless disregard for the lawfulness of its acts, because employer had consulted with its attorneys, met with its employees, and devised a plan specifically for the purpose of complying with the ADEA).

c.     Wachovia Willfully Violated USERRA's Prohibition
Against Constructive Discharge.

USERRA prohibits an employer from terminating a returning veteran within one year of reemployment, except for cause. 38 U.S.C. § 4316(c). The "purpose of this special protection is to ensure that the returning serviceperson has a reasonable time to regain civilian skills and to guard against a bad faith or pro forma reinstatement." H.R. Rep. 103-65(1) * 35; see also 70 FR 75246-01 at 75279 ("Prohibiting a reemployed service member's discharge, except for cause, ensures that the service member has a reasonable amount of time to get accustomed to the employment position after a significant absence"); Warren v. International Business Machines Corp., 358 F.Supp.2d 301, 314 (S.D.N.Y. 2005) ("A central goal of § 4316(c) is to provide employment retention rights based on the length of uniformed service, 'which may give rise to a need for time to retrain and readjust to the civilian job after an absence'"), quoting S.Rep. No. 103-158, at *63.

The jury found that Wachovia violated this provision of USERRA by constructively discharging Mr. Serricchio. In reaching this conclusion, the jury was required to find that Wachovia intentionally or deliberately made his working conditions so intolerable that Mr. Serricchio was forced to quit involuntarily. See Jury Instruction at 10.[15] There is little doubt that Wachovia's conduct in

---

[15] The jury's finding of Wachovia's deliberate or intentional conduct in creating conditions that causing Mr. Serricchio to quit involuntarily is binding on the Court in its determination of liquidated

constructively discharging Mr. Serricchio must be deemed willful.

Ms. Gibbons, Wachovia's designated witness on the application of its military leave policy, expressly admitted Wachovia's knowledge of USERRA's one-year prohibition on termination of returning veterans:

> Q.    You can't fire somebody without cause for a year?
>
> A.    Correct.
>
> Q.    You know that USERRA provides that?
>
> A.    Yes. [Gibbons, Trial Tr. at 436:22-25] (attached as Exhibit E)].[16]

Given Gibbons' admission that Wachovia had actual knowledge that USERRA prohibited Mr. Serricchio's termination, without cause, for one year, the jury's finding that Wachovia deliberately or intentionally created the environment that caused Mr. Serricchio's resignation is more than sufficient for a finding of willfulness. See Benjamin v. United Merchs. & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir.1989) (upholding liquidated damages "when the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion").

### E.    Mr. Serricchio Is Entitled to Prospective Equitable Relief in the Form of Reinstatement or, if Reinstatement Is Deemed Impracticable, an Award of Front Pay.

It is a fundamental principle of federal employment law that to make an employee whole for injuries from an employer's violations of federal law, it is necessary to provide not only relief for past

damages. Sorlucco v. N.Y.C. Police Dept., 971 F.2d at 873-74; Wade v. Orange County Sheriff's Office, 844 F.2d at 954.

[16] Ms. Gibbons further acknowledged her understanding of the term "constructive discharge" – "it would mean that the employment conditions were such that [the employee] could no long work under them, so [he] left, and in effect felt like [he] had been put in a position by the company to do nothing else but leave. Id.

injury, but prospective relief to prevent an employer's wrongful conduct from causing harm in the future. Thus, like other federal employment statutes, USERRA authorizes a federal court to order prospective equitable relief to a prevailing plaintiff to prevent future losses from an employer's violation of the Act.[17] In particular, a court is empowered to order reinstatement of the employee to his position (or an appropriate equivalent position) with appropriate compensation, job responsibility and status or, if reinstatement is not feasible, an appropriate order for front pay in lieu of reinstatement. Id.

As Mr. Serricchio has previously advised the Court[18] and as he testified at trial, Mr. Serricchio seeks reinstatement to his Financial Advisor position at Wachovia with provision for appropriate compensation, job responsibility and status. Mr. Serricchio will address below his entitlement to such reinstatement. Mr. Serricchio will also discuss below the alternative remedy of front pay, should Wachovia contend and the Court find that reinstatement is not feasible.

1.      Mr. Serricchio Is Entitled to an Order of Reinstatement

Where a plaintiff establishes that he has been wrongfully terminated in violation of a federal employment statute, a court is empowered to order reinstatement as equitable relief to make the employee whole and avoid future losses. See Reiter v. MTA New York City Transit Authority, 457 F.3d 224, 230 (2d Cir. 2006). "Reinstatement advances the policy goals of make-whole relief and deterrence in a way which money damages cannot." Id. (quoting Squires v. Bonser, 54 F.3d 168, 172-72 (3d Cir. 1995)); accord Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 43 (1st Cir. 2003)

---

[17] 38 U.S.C. § 4323( d)(1)(E) authorizes a court to utilize the full extent of its equitable powers to provide a remedy to a returning veteran injured by violations of USERRA. Section 4323(d)(1)(A) authorizes a court to enter orders to enforce compliance with USERRA.

[18] See Plaintiff's June 3, 2008 Memorandum in Response and Opposition to Defendant Wachovia Securities LLC's Motion in Limine Re: Back Pay and Front Pay (Dkt #144 ) at 2

("reinstatement is an important remedy because it most efficiently advances the goals of Title VII by making plaintiffs whole while also deterring future discriminatory conduct by employers").

The law is clear that reinstatement is the preferred remedy in federal employment cases for prospective losses. See Reiter at 230 (noting "overarching preference" for reinstatement in employment discrimination cases); Brooks v. Travelers Ins. Co., 297 F.3d 167, 170 (2d Cir. 2002) (noting that under Title VII, reinstatement is first choice); Blum v. Witco Chem. Corp., 829 F.2d 367, 373 (3d Cir. 1987) ("back pay, coupled with reinstatement, is the preferred remedy [for] future damages"); Allen v. Autauga County Bd. of Educ., 685 F.2d 1302, 1305 (11th Cir. 1982) (reinstatement required "except in extraordinary cases"); Shaw v. Greenwich Anesthesiology Associates, P.C., 200 F. Supp. 2d 110, 114 (D. Conn. 2002) (Dorsey, J.) (same).

Wachovia is a nationwide brokerage firm with offices throughout the Northeast, including Massachusetts (where Mr. Serricchio currently resides) and adjacent areas of Connecticut. Wachovia remains in the retail brokerage business and employees and hires Financial Advisors on an ongoing basis. Wachovia further maintains control over its client accounts and as of December 2003 had over $600 billion in retail brokerage AUM, including accounts of brokers leaving the company's employ and accounts generated by new client calls. Wachovia has never contended that it is unable to reinstate Mr. Serricchio and that it is unable to provide him with an appropriate portfolio of client accounts to manage.

Although reinstatement may be denied when there is bad blood between the parties that makes resumption of a working relationship impossible, Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 125 (2d Cir. 1996), or where a potential position no longer exists, Blum v. Witco Chem. Corp., 829 F.2d 367, 373 (3d Cir. 1987), neither of these circumstances applies in this case. The branch manager

34

and other branch personnel involved in the events at issue in this litigation are no longer associated with Wachovia, and the employee relations manager who supervised Mr. Serricchio's reemployment process is assigned to a different area of the company. While Wachovia apparently continues to dispute that it violated any of Mr. Serricchio's rights,[19] neither prior to or during this litigation has Wachovia expressed any rancor toward Mr. Serricchio.

Under USERRA, Mr. Serricchio was entitled to re-employment in December 2003 as if he had never left for military service, see 38 U.S.C. §§ 4323( d)(1)(a); (e), and the terms of any order of reinstatement now must, appropriately, reflect the compensation and job status Mr. Serricchio would likely have enjoyed had he been reinstated to his Financial Advisor position on December 18, 2003 and remained employed by Wachovia to date.

As discussed above, the trial evidence offered by Wachovia establishes that it is likely that Mr. Serricchio's assets under management would have grown by at least $1 million per month to approximately $90 million in the 85 month period from September 30, 2001 (when he was activated) to date. Dr. Cunitz has calculated Mr. Serricchio's likely annual compensation as of November 1, 2008 at approximately $332,000 (plus benefits) for 2008-09 and determined that it would increase by approximately $40,000 per year in subsequent years. [See Exhibit G (Cunitz Exhibit A4)].

While Mr. Serricchio contends that he is entitled, upon reinstatement, to receive compensation from Wachovia equal to what he would have earned but for Wachovia's illegal conduct, he recognizes that he is in need of retraining (and re-licensing) before he can resume his active career as a Financial Advisor and that, after re-training (and re-licensing), it is reasonable to restore his account

---

[19] Plaintiff notes that in its post-Verdict motions, Wachovia has not challenged the jury's finding that it violated USERRA's requirement of prompt reinstatement.

responsibility over a period of time. Accordingly, Mr. Serricchio seeks the following Order of

reinstatement:

> 1. Reinstatement to a position as a Financial Advisor in a Wachovia office near his home in Massachusetts or adjacent locations in Connecticut;
>
> 2. Annual compensation starting at $340,000, plus benefits, increased annually per Dr. Cunitz's schedule;
>
> 3. During the period of time that Mr. Serricchio is in re-training and re-licensing, compensation should be paid as salary. Thereafter, Wachovia must assign accounts to Mr. Serricchio over time to bring him up to $90 million AUM (plus $1 million per month for each month of employment prior to resuming active status as a Financial Advisor). Mr. Serricchio is to continue to receive a salary at the determined rate, offset by any actual commissions Mr. Serricchio earns on the accounts assigned to him or other accounts he is able to generate after he resumes active status as a Financial Advisor. Wachovia can determine the rate at which the new accounts are assigned to Mr. Serricchio, but must pay him salary to make up any commission earning shortfalls until it provides him with AUM generating sufficient ROA to produce net commission earnings at the compensation levels projected by Dr. Cunitz;
>
> 4. Full seniority and other length of service benefits that would have accrued to Mr. Serricchio had he remained employed from December 18, 2003 to date;
>
> 5. No termination except for cause (which does not include failure to grow his accounts under management).

> 2. If Reinstatement is Denied, Mr. Serricchio is Entitled to an Award of Front Pay.

In a recent telephone conference with the Court, Wachovia counsel suggested that reinstatement

might not be feasible given Mr. Serricchio's extended absence from the financial services industry.

Should Wachovia persuade the Court that reinstatement is not a feasible remedy, Mr. Serricchio is

entitled to recover an award of front pay sufficient to render him whole for the prospective injuries he

will suffer as a result of Wachovia's violations of USERRA. See Duarte at 1049.

Where a court declines to order reinstatement as a prospective remedy for violation of a federal

employment statute, "front pay is a remedy presumed appropriate unless record evidence clearly

demonstrates the contrary." Farber v. Massillon Bd. of Education, 917 F.2d 1391, 1397 (6th Cir.

1990). As the Second Circuit has stated (in the ADEA context):

> Denial of reinstatement in those situations, without an award of reasonable,
> offsetting compensation, would leave the plaintiff irreparably harmed in the
> future by the employer's [illegal conduct], and would permit the defendant's
> liability for its unlawful action to end at the time of judgment. To prevent this
> injustice a reasonable monetary award of front pay is necessary as "equitable
> relief *** appropriate to effectuate the purposes of [the act]."

Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir. 1984).

Should reinstatement be denied in this case, an award of front pay is especially appropriate

given the destruction of Mr. Serricchio's *career* employment opportunities in the financial services

industry and the likelihood that Mr. Serricchio will never again obtain employment at pay comparable

to what he would have been able to earn as a Financial Advisor.

Courts awarding front pay in lieu of reinstatement have recognized that where it is unlikely that

a plaintiff will be able to return to the level of income that he would have enjoyed had he not been

wrongly terminated, the plaintiff is entitled to a front pay award compensating him for such career

losses. Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 126 (2d Cir. 1996) (affirming front pay

award of 20 years to retirement age, where employee has no likely prospect of matching prior

earnings), cert. denied, 520 U.S. 1274 (1977); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d

Cir. 1992), cert. denied 506 U.S. 825 (1992) (affirming front pay award of 17 years); accord Scarfo v.

Cabletron Systems, Inc., 54 F.3d 931, 954-55 (1st Cir. 1995) (approving front pay award of $744,744,

more than three times the size of the back pay award, where district court found that plaintiff was "a

displaced worker and will be unable to find professional employment in the future").

"A front pay award 'serves a necessary role in making victims of [illegal conduct] whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.'" Padilla at 126 (quoting Whittlesey, 742 F.2d at 729). Consistent with this principle, the Second Circuit has recognized that an award of front pay for the plaintiff's entire remaining work life expectancy is appropriate where a plaintiff has no reasonable prospect of obtaining earnings at a compensation level equal to what he would have earned but for his employer's illegal conduct. Padilla at 126; Tyler at 1189.

Should the Court award front pay, Mr. Serricchio does not seek an award of front pay equal to the entire amounts he would likely have earned from Wachovia. Mr. Serricchio's tanning salon business has, as he hoped, evolved into a profitable venture, and he recognizes that Wachovia is entitled to an offset to its front pay liability for the salary/profits his tanning salon business will likely generate in future years.

But it is clear that Mr. Serricchio's earning capacity as a Financial Advisor at Wachovia was greater than his likely earning capacity in the tanning salon business. That is the future loss that a front pay award must properly address to satisfy the statutory goal of making Mr. Serricchio whole for his future losses. Mr. Serricchio thus seeks a front pay award that reflects the career earnings losses that he will suffer as a result of the likely earnings differential between the two occupations.

Dr. Cunitz has calculated this differential over the remainder of Mr. Serricchio's work-life expectancy to his Social Security age 67, and reduced the amount to present value. Mr. Serricchio is presently 36 years old and will turn 67 in June 2039. As Dr. Cunitz will document in his testimony at trial, Mr. Serricchio's likely earnings differential (discounted to present value) through that time equals

approximately $16.076 million. [See Exhibit G (Cunitz Exhibit A4), showing Mr. Serricchio's likely future annual losses for each year from 2008 on.)

Plaintiff recognizes that this is a very substantial amount. But the effect of Wachovia's wrongful conduct was to prevent Mr. Serricchio from pursuing a career in a lucrative profession that would, especially in later career years, provide very substantial earnings. Front pay is specifically intended to make the employee whole for these future losses. Mr. Serricchio respectfully submits that he should not be penalized in the determination of his future losses because the amount of his future losses is substantial.

### D.　Attorneys' Fees, Expert Witness Fees and other Litigation Expenses

USERRA provides that a prevailing plaintiff may recover his attorneys' fees, expert witness fees and other litigation expenses. See 38 U.S.C. § 4323(h)(2). Absent a post-Judgment ruling setting aside the jury's Verdict, plaintiff is undeniably a prevailing party in this litigation. Buckhannon Board & Care Home, Inc. v. West Virginia Board of Health and Human Resources, 532 U.S. 598, 605 (2001); Staub v. Proctor Hosp., 2008 WL 2001935, *3 (N.D. Ill., May 07, 2008 ) (Gorman, Mag. J. (plaintiff is prevailing party under USERRA if plaintiff succeeded "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit").

Local Rule 11 provides that any motion for attorneys' fees must be filed within 30 days of entry of judgment (extending the 14 days allowed under F.R.Civ.Pro. 54(d)(2)). However, this schedule would potentially require plaintiff's fee application to be filed prior to completion of post-judgment motions since if the motions are denied, the final Judgment in this action may have been entered over 30 days prior to the Court's ruling.

Plaintiff anticipates there will be extensive post-Judgment motion practice in this action. Such motion practice will require expenditure of legal time and cost and could, if either of defendant's anticipated motions is granted, alter plaintiff's status as a prevailing party. Accordingly, plaintiff requests an extension of time until 30 days after the ruling on post-Judgment motions to submit his fee and cost application. This extension will enable plaintiff to include the fees and costs incurred in post-Judgment proceedings in his application (assuming such application remains warranted after such rulings). Plaintiff respectfully requests the Court to include this schedule for any fee and costs application in its post-Damages Phase ruling.

Subsequent to a decision on the post-Judgment motions, if plaintiff remains a prevailing party, plaintiff will confer with defendant in an effort to reach agreement on the amount of attorneys' fees and costs to be awarded and, failing that, will file appropriate documentation in support of any claimed award.

## III.   Conclusion

For the foregoing reasons, plaintiff Michael Serricchio is entitled to orders awarding the equitable relief discussed above.

PLAINTIFF MICHAEL SERRICCHIO,

BY:   /s/ David S. Golub
   DAVID S. GOLUB ct00145
   CRAIG N. YANKWITT ct26165
   SILVER GOLUB & TEITELL LLP
   184 ATLANTIC STREET
   P.O. BOX 389
   STAMFORD, CONNECTICUT 06904
   Tel.: (203) 325-4491
   Fac.: (203) 325-3769
   dgolub@sgtlaw.com
   cyankwitt@sgtlaw.com

## CERTIFICATION

I hereby certify that on September 18, 2008, a copy of the foregoing Plaintiff's Trial

Memorandum re: Equitable Relief was filed electronically and served by mail on anyone unable to

accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on

the Notice of Electronic Filing. Parties may access this filing nithrough the Court's CM/ECF System.

/s/ Craig N. Yankwitt
CRAIG N. YANKWITT ct 26165
SILVER GOLUB & TEITELL LLP
184 Atlantic Street
P. O. Box 389
Stamford, CT 06904
Telephone: 203-325-4491
Fax: 203-325-3769
cyankwitt@sgtlaw.com