UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Michael Serricchio,<br>    *Plaintiff,*<br><br>        *v.*<br><br>Wachovia Securities, LLC,<br>    *Defendant.* | Civil No. 3:05cv1761 (JBA)<br><br><br><br>March 19, 2009 |

**MEMORANDUM OF DECISION**

Before being recalled to active duty with the United States Air Force in September 2001, Michael Serricchio was employed as a financial advisor with Prudential Securities, Inc. in Stamford, Connecticut. Two years later, he returned to find that the company had been acquired and renamed Wachovia Securities, LLC ("Wachovia"),[1] and that his position was no longer available to him on the same terms as when he had been activated. Serricchio then sued Wachovia for violating his rights under the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.* ("USERRA"). *See generally Serricchio v. Wachovia Securities, LLC*, 556 F. Supp. 2d 99, 102–104 (D. Conn. 2008) (summarizing the factual background to the case and granting in part Wachovia's motion for summary judgment). On June 17, 2008, a jury found Wachovia liable for failing to reinstate Serricchio as required by USERRA and for constructively discharging him. Now before the Court is the question of what damages and equitable relief Serricchio is entitled to recover as a result of this finding of liability. Serricchio seeks back pay, liquidated damages, reinstatement,

---

[1] Subsequently, during the damages phase of the trial and amid accelerating distress in the U.S. economy, Wachovia Corporation was bought by Wells Fargo & Co. This acquisition, however, has no bearing on the issues addressed in this decision. For simplicity, the Court will refer to the Defendant (and its predecessor and successor entities) as "Wachovia."

attorney's fees, and litigation costs.

The parties presented evidence on these issues in a bench trial held in October 2008, with each side heavily relying on expert testimony. The experts—Dr. Jonathan Cunitz on behalf of Serricchio, and Paul Marcus on behalf of Wachovia—offered different approaches to the task of analyzing and understanding the relevant financial and economic considerations. The Court's findings, which incorporate aspects of both Cunitz's and Marcus's opinions, follow.

## I.      Back Pay

Serricchio first seeks a monetary award to compensate him for what he would have earned at Wachovia had he been reinstated as required by USERRA. A person returning to employment from military service "is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional security and rights and benefits that such person would have attained if the person had remained continuously employed." 38 U.S.C. § 4316(a). According to the associated federal regulations, this "escalator principle" means that an employer is required to reemploy the returning veteran "in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service." 20 C.F.R. § 1002.191. In a civil action brought pursuant to USERRA, a "court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of [USERRA]." 38 U.S.C. § 4323(d)(1)(B); *Duarte v. Agilent Techs., Inc.*, 366 F. Supp. 2d 1039, 1048–49 (D. Colo. 2005).

###### A.       Plaintiff's Evidence

To prove his entitlement to compensation for lost wages and benefits, Serricchio offered the expert testimony of Dr. Jonathan Cunitz, a consultant and financial analyst.  In his testimony during the damages phase of the trial, Cunitz explained that he calculated Serricchio's lost earnings using a simple formula: Serricchio's assets under management ("AUM"), multiplied by the return on assets ("ROA"), multiplied by an appropriate payout ratio ("PR").

To reconstruct Serricchio's AUM—meaning, his share of the assets in his accounts for the back-pay period—Cunitz started with the total assets for which Serricchio was responsible when he left for military service.  Incorporating the terms of the account-sharing agreements he had with other brokers at Wachovia, Cunitz determined that Serricchio's AUM were $4,175,047 as of September 2001.  (Pl.'s Ex. 136.)  Assuming that Serricchio would have continued to grow his book of business had he remained at Wachovia, Cunitz then needed to estimate the extent of this growth over the back-pay period, which he did by incorporating the earlier trial testimony of Craig Watson, the manager for Wachovia's Stamford branch when Serricchio was there.  During the liability phase of the trial, Watson testified that trainees in the Stamford branch were expected to build up assets at a rate of at least "half a million a month," and in reality "closer to a million a month" if they wanted to truly succeed.  (Tr. 639:19–640:1, June 13, 2008.)  Cunitz explained how he then calculated the growth of Serricchio's accounts using this "million a month" standard as follows:

> Q.       . . . [S]o then how did you apply this million dollars over the back pay period?  What did you do?

> A.   Well, I prepared a schedule month by month where I added the million dollars, and then I calculated the average assets under management for each month using the starting assets, averaging them together in a simple average calculation.  And in my schedule, then I have month by month the average assets under management for the full back pay period.

(Tr. 171:24–172:9, Oct. 2, 2008.)

For the second variable in his back-pay methodology, Cunitz determined Serricchio's likely return on assets by reviewing Serricchio's record of past earnings and by incorporating the information contained within an internal Wachovia document, the "FA Deal Analyzer," that was generated when Serricchio was hired.  In his testimony, Cunitz referenced a number of different relevant ROA figures—including 3.73%, 2.03%, and 0.9%—and explained that a realistic return rate would bear an inverse relationship to Serricchio's AUM:

> Q.   What ROA did you actually use for the back pay period for Mr. Serricchio and why did you use it?
>
> A.   Well, I started dropping the return on assets down as Mr. Serricchio's assets grew.  So that . . . starting December of 2003, I dropped the return on assets to 1.40 percent  just for that two-week period . . . .  For 2004 I dropped it down to 1.07 percent, pretty much evenly to get down to the .9 percent for 2005 going forward.  So for 2005, rather than rely upon what he had historically achieved, I brought it down to actual results for the Stamford office.

(Tr. 184:25–185:12, Oct. 2, 2008.)

Consistent with the figure shown in the deal analyzer, Cunitz applied a payout ratio (the third variable) of 39%, the same ratio used by Wachovia's expert.  In addition to his estimation of commissions, Cunitz also assumed that Serricchio would have been entitled to $65,595 in deferred compensation that would have vested in 2005.  Wachovia does not dispute that assumption.  (Tr. 705:3–10, Oct. 8, 2008.)  Thus, applying his methodology,

4

Cunitz determined that Serricchio was entitled to a total of $1,052,009 in lost earnings.

Broken down by year, Cunitz's projections are as follows:

| | | | |
|---|---|---|---|
| 2003 | $ | 6,494 | (from 12/18/2003) |
| 2004 | | 155,131 | |
| 2005 | | 172,604 | |
| 2005 | | 65,595 | (vested 10/31/2005) |
| 2006 | | 214,724 | |
| 2007 | | 256,844 | |
| 2008 | | 246,212 | (to 10/31/2008) |
| **Total** | | **$1,052,009** | |

(Pl.'s Ex. 110.) Cunitz also added to this an estimation of employment benefits, which he calculated at 15% of commissions income.

**B.    Defendant's Evidence**

Wachovia's expert, Paul Marcus, also a financial consultant, offered a similar methodology for estimating Serricchio's lost earnings—that is, AUM times ROA times PR—but with a critical difference. Rather than estimating the growth of Serricchio's assets by relying on Watson's testimony about expectations at the Stamford branch, Marcus calculated the AUM with a more standardized approach. To take account of the "escalator principle," Marcus pegged the growth of Serricchio's assets to the S&P 500 index for the duration of Serricchio's military service. Then, Marcus estimated that, upon Serricchio's return in late 2003, his assets would have increased by 12% annually.

With Serricchio's assets calculated in this manner, Marcus applied a 2.03% ROA and (consistent with Cunitz) a 39% PR. Thus, adding in the deferred compensation which would

have vested in 2005, Marcus's projections of Serricchio's lost earnings are as follows:

| | | | |
|---|---|---|---|
| 2003 | $ | 1,424 | (from 12/18/2003) |
| 2004 | | 36,264 | |
| 2005 | | 40,616 | |
| 2005 | | 65,595 | (vested 10/31/2005) |
| 2006 | | 45,490 | |
| 2007 | | 50,948 | |
| 2008 | | 45,174 | (to 10/15/2008) |
| **Total** | **$** | **285,512** | |

(Def.'s Ex. A.)  Marcus also testified that, "for the sake of argument," he re-ran the same calculations using ROAs of 3% and 3.73%, which lead to total lost earnings of $390,595 and $469,678, respectively.  (Def.'s Exs. C, D.)  Marcus did not add any additional amount for benefits on the assumption that Serricchio would have been entitled to such benefits wherever he was employed.

### C.    Analysis and Findings

Given these two divergent estimates of Serricchio's lost earnings, the question is which approach better reflects reality.

Starting with Cunitz's model, the Court finds it implausible that Watson could have meant to say that brokers such as Serricchio were expected to increase their assets under management by the same rate indefinitely.  While some brokers might have found success after being able to grow their assets by a million dollars a month at first, it defies logic to think that such a rate would never level off.  The more realistic interpretation of what Watson said—which is consistent with his testimony during the damages phase—is that only those brokers who develop profitable books of business will be able to outlast their peers and succeed beyond the trainee level.  Further, in projecting the growth of assets, Cunitz did not completely take into account the fact that much of Serricchio's commissions were derived

from accounts that he shared with other brokers. Thus, Cunitz's methodology relies on overly aggressive assumptions concerning Serricchio's ability to generate commissions as a broker.

Although Marcus's approach using indexed growth rates has superficial appeal, it, too, is imperfect.  The bottom line of Marcus's methodology is that Serricchio, upon returning from military service, would have seen his yearly commissions fall significantly—from approximately $80,000 to $35,000 or a bit more.  If the purpose of reinstatement under USERRA is to reemploy a veteran as if he had never left, it is hard to see this precipitous decline in earnings as anything but either a penalty or a methodological error.  Marcus's additional estimates close this earnings gap somewhat, but even under the version of the model using a 3.73% ROA, Serricchio would have seen his commissions fall as of 2003.  The Court agrees, however, that Serricchio is not entitled to an additional 15% of his commissions income representing employment benefits, as there was insufficient evidence offered to justify that additional award above any offsetting benefits he received from his other business endeavors during the back-pay period.

Marcus's approach, while problematic in part, does illustrate some of the difficulties inherent in projecting the success of anyone working in the financial markets.  Although the Court's task is to fairly compensate Serricchio for the earnings he lost by Wachovia's failure to reinstate him, it remains true that, given the competitiveness and vagaries of his line of work, any back-pay award which assumes his constant employment and income stream is in some sense an optimistic one.  Wachovia also offered testimony—from Watson and from Carson Coyle, formerly a branch administrator in Stamford—which corroborated Marcus's understanding that to assume a ROA of 2% or higher for an extended period of time is not

7

feasible because it implies an unusually high level of market activity.  Yet, rather than develop an approach which incorporated a more modest ROA, Marcus applied these aggressive rates of return to his otherwise more conservative asset estimates, creating an odd mix.

Nonetheless, there is a middle ground that the Court finds both adequately accounts for the uncertainty here and appropriately follows the principles of USERRA.  Cunitz testified under cross-examination that, before he elected to rely on the "million a month" figure derived from Watson's testimony, his methodology estimated Serricchio's back pay differently.  By assuming a constant relationship between the assets Serricchio had under management and the returns those assets generated, Cunitz incorporated the information shown in the deal analyzer and estimated that Serricchio's commissions would have increased by 9% per year.  This results in a comparatively lower estimate of commissions income: by Cunitz's earlier approach, Serricchio would have earned between $80,000 and $114,000 per year from 2004 to 2008, for a total of about $500,000 in commissions over the back-pay period (plus the deferred compensation).  The trial record also includes a chart (Pl.'s Ex. 130) in which Cunitz used the same 9% growth rate but with a slightly higher starting point.  Plaintiff's counsel referenced this latter model in his closing argument, suggesting that these figures constitute a fair lower bound for the estimate of commissions income.  (Tr. 743:21–744:13.)

It is this final model that the Court finds most persuasive.  Extending the time period to the present generates the following yearly earnings:

| | | | |
|---|---|---|---|
| 2003 | $ | 3,667 | |
| 2004 | | 95,936 | |
| 2005 | | 170,165 | (incl. deferred compensation) |
| 2006 | | 113,981 | |
| 2007 | | 124,240 | |
| 2008 | | 135,421 | |
| 2009 | | 36,902 | |
| **Total** | **$** | **680,312** | |

By relying on Wachovia's own figures in the deal analyzer, this approach strikes a balance between the competing considerations that favor either Serricchio or Wachovia and that are difficult to reconcile.  And the resulting compensation numbers also remain true to the terms and objectives of USERRA.  Accordingly, the Court finds the value of Serricchio's lost earnings at Wachovia to be $680,312.[2]

## II.    Mitigation

A back-pay award to compensate Serricchio for his lost earnings must reflect an offset for income he earned during the back-pay period.  Wachovia claims that Serricchio should be barred from any recovery because he failed to mitigate his damages when he went into the tanning-salon business rather than finding another brokerage job.  While Serricchio

---

[2] It is impossible to ignore the fact that this case operates against the backdrop of a global financial crisis, as illustrated by market events contemporaneous with the second phase of this trial alone, during which the Dow Jones Industrial Average fell by more than a thousand points.  Thus, the back-pay figure accepted by the Court, derived from evidence offered after the economic collapse had begun but before it had reached its nadir (if it has), does not reflect the full impact that changes in market conditions have had (and will have) on the annual earnings of financial advisors at Wachovia.  Any adjustments made to account for this uncertainty, however, would be the result of pure speculation.  Accordingly, the Court will make its findings based solely on the evidence in the record.

contends that he satisfied his duty to mitigate, he offered evidence that purported to show that his actual income from the tanning salons was only a very small amount.  The parties set out their respective positions in their pre-trial briefs and on the record during the bench trial.

A.      **Legal Framework**

Serricchio does not dispute that he had a duty to mitigate his loss of wages.  He contends, however, that Wachovia has misstated the law on mitigation and that he fulfilled his duty to mitigate by working alongside his wife in their startup tanning-salon business.  Wachovia argues that Serricchio's decision to pursue self-employment was not a reasonable effort at mitigation and that he further failed to mitigate his losses by not accepting Wachovia's inferior offer of reinstatement in March 2004.

As the employer, Wachovia "bears the burden of demonstrating that [the] plaintiff has failed to satisfy the duty to mitigate." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005).  A defendant can meet this burden "by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997).  But an employee's "obligation" to minimize her wage losses "is not onerous and does not require her to be successful" in seeking a new job.  *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998).  In short, the "question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830 (2d Cir. 1992).  In *Hawkins*, the court observed that reasonable mitigating actions taken by an employee may include rejecting a demotion, declining a "demeaning position," "earnest[ly] search[ing] for better employment," and even "[s]elf-employment, if . . .

10

undertaken in good faith [as] a reasonable alternative to seeking other comparable employment." 163 F.3d at 696. As to this final option, the Second Circuit has noted that it is "well settled that self-employment is an adequate and proper way for the injured employee to attempt to mitigate his loss of wages, and that a person is not required to look for other employment while he is reasonably engaged in self-employment." *F.E. Hazard, Ltd. v. N.L.R.B.*, 917 F.2d 736, 737 (2d Cir. 1990) (quotation marks and citations omitted).[3]

Other circuits agree that under appropriate circumstances self-employment may be a proper way to mitigate earnings losses. For example, in *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 433–34 (7th Cir. 1992), the plaintiff was fired from her position as restaurant manager for age-related reasons. She then went to a state agency seeking similar positions, but, after getting no positive responses, decided to open her own restaurant by taking out a loan and relying on her own savings and a gift. *Id.* at 434. The restaurant gradually began turning a profit, and so the court found that she had mitigated her damages and was entitled to an award of back pay: "Smith's efforts in opening and

---

[3] On the related question of under what circumstances a plaintiff responsible for mitigating her damages may abandon a job search and attend school instead, the Second Circuit has found the following jury instruction to be an accurate statement of the law:

> A plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment. A plaintiff need not go into another line of work, accept a demotion or take a demeaning position but must use reasonable care and diligence in seeking a job substantially equivalent to the one that was lost. While a plaintiff who abandons her willingness to search for and return to work and chooses to attend school instead generally does not meet her duty to mitigate damages during the time she is in school, a plaintiff who chooses to attend school only when diligent efforts to find work proved fruitless or who continues to search for work even while enrolled in school does meet her duty to mitigate.

*Dailey*, 108 F.3d at 458 n.1.

11

operating Lucy's Family Dining were serious and in fact much greater than required by an ordinary full-time job.  A jury could rationally determine that Smith's self-employment was a reasonable, good faith exercise of diligence."  *Id.* at 438.  The Fifth Circuit's decision in *Hansard v. Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461 (5th Cir. 1989), is not to the contrary.  Recognizing that "[a] plaintiff's decision to become self-employed, alone, does not indicate a lack of reasonable diligence," the panel instead found the mitigation efforts "simply insufficient" because the plaintiff, rather than approaching his flea-market enterprise as a business, instead "primarily gathered odds and ends from his home and sold them."  *Id.* at 1458.

Mindful of these principles, the Court must determine whether Serricchio's pursuit of self-employment in a wholly different field constituted adequate mitigation, and, if so, what value should be attributed to Serricchio's efforts for the purpose of adjusting the lost-earnings calculation.

### B.      Plaintiff's Evidence

In his testimony during the damages phase of the trial, Serricchio detailed the efforts he and his wife undertook to open their chain of tanning salons.  By Serricchio's telling, they opened the first store in September 2003 in Amherst, Massachusetts.  When Wachovia did not rehire him, Serricchio still remained hopeful that he would eventually get his job back, and at the same time he was concerned about the effect that a negative mark in his broker records (from the settlement of a client complaint) would have on his ability to get a comparable job at another firm.  Consequently, to keep open his options for returning to the brokerage field, Serricchio "stuck it out" and decided to expand the tanning business rather than looking around for other finance work.  He and his wife subsequently opened stores

in Connecticut, Rhode Island, and at a second location in Massachusetts, all attempting to target the college demographic.  Through these expansion efforts, Serricchio made ongoing capital investments in his stores.

Using Serricchio's tax returns, Cunitz offered two methods for determining the value of these mitigation efforts.  First, Cunitz took the revenue generated by the tanning salons—more than $1.2 million from 2004 to 2007—and then accounted for operating expenses and capital investments.  But because Serricchio heavily reinvested in his business, this "cash flow" analysis generates negative numbers in all but one year, and results in total net mitigation earnings of $400.  Alternatively, Cunitz employed a "taxable earnings" analysis, according to which Serricchio earned an average of $24,000 per year from 2004 through 2008.

### C.    Defendant's Evidence

In addition to arguing that Serricchio failed to mitigate his damages at all by seeking self-employment, Wachovia also offered two alternative ways to assess the value of Serricchio's mitigation efforts.  Marcus first offered a way of estimating what a person in Serricchio's position would have earned by looking to Department of Labor statistics.  Accounting for Serricchio's educational background and socioeconomic situation, Marcus estimated that Serricchio could have earned, at minimum, between $50,000 and $65,000 per year had he looked for work in the greater Connecticut area.  Marcus also presented his own "cash flow" analysis of earnings from the tanning salons, but his findings were limited to only 2006 and 2007.  For each of those years, Marcus determined that Serricchio earned the equivalent of between $64,000 and $100,000 from his business.

13

### D.    Analysis and Findings

On the question of whether the Plaintiff satisfied his duty to mitigate damages or whether he should be barred from any recovery, Serricchio points to his efforts to succeed as the owner of a small business.  Whether or not the venture generated equivalent earnings to his work as a broker, he argues, the dedication to expanding and reinvesting in the business shows that he adequately pursued other employment opportunities when Wachovia failed to reinstate him.  The Court finds that pursing this course of action, rather than accepting a lower-paying position at Wachovia or seeking other employment in the finance sector, was consistent with Serricchio's duty to mitigate his losses.  As the Seventh Circuit noted in *Smith v. Great American Restaurants*, "[t]he notion that starting one's own business cannot constitute comparable employment for mitigation purposes not only lacks support in the cases, but has a distinctly un-American ring."  969 F.2d at 438.  Thus, while the business may not have been immediately lucrative, Serricchio's efforts as a business owner do not, as a matter of law, constitute insufficient mitigation.  Accordingly, the Court rejects Wachovia's defense that Serricchio failed to mitigate altogether.

The issue, then, is how to quantify the value Serricchio received from the tanning business.  Neither expert provided a persuasive explanation on this point.  Cunitz's first analysis, based on cash flow, suggests that Serricchio earned $400 over the whole of the back-pay period.  Leaving aside the absurdity of this figure, to accept it would necessarily cast doubt on whether Serricchio had in fact mitigated his damages by persisting with a worthless business.  The business obviously provided Serricchio with some purchasing power, or else he could not have bought a Hummer (which he later traded in for a Chevrolet Silverado).  Cunitz's second analysis is little better, for it is difficult to accept the proposition

14

that Serricchio supported himself and his family on as little as $10,000 a year.  Serricchio

testified as much when he explained—in the context of questioning about the relevance of

the depreciation deductions shown on the tax returns—how the tanning business provided

him with the money his family needed to meet their necessary expenses:

> The Court:       So the cash from the tanning salon served the purpose that
>                  Wachovia failed to serve?
>
> [Serricchio]:    Yes, and most of it was recognized through the depreciation,
>                  ma'am.
>
> The Court:       I don't want to know about the accounting part, I want to
>                  know how you were living. . . .  So how much of the cash,
>                  however accounted for, that you received from the Amherst
>                  tanning salon . . . did you live on?
>
> [Serricchio]:    We lived on a majority of it . . . .
>
> The Court:       And can you give me a breakdown on those numbers?  You
>                  said the majority of it was cash from the business plus your
>                  disability and your retirement from the military.  Can you
>                  give me some qualification of what those numbers looked like
>                  in '04? . . .
>
> [Serricchio]:    60 to 70 percent to pay for mortgages, automobile payments,
>                  insurances, some type of savings.
>
> The Court:       So in rough numbers, that is sixty to seventy thousand.
>
> [Serricchio]:    That would be correct.

(Tr. 142:23-144:12, Oct. 2, 2008.)

Marcus's statistical estimate of Serricchio's earning power thus appears entirely

reasonable when placed alongside Serricchio's own description of his family's financial

situation from 2004 forward.  Accounting for the fact that Serricchio's duty to mitigate did

not arise until after the end of March 2004, and assuming approximately the same growth

rate for 2008 and 2009, the value of Serricchio's mitigating earnings according to Marcus are

as follows:

| | | | |
|---|---|---|---|
| 2003 | $ | 0 | (no mitigation necessary) |
| 2004 | | 38,065 | (from 4/1/2004) |
| 2005 | | 52,664 | |
| 2006 | | 56,850 | |
| 2007 | | 60,836 | |
| 2008 | | 65,045 | |
| 2009 | | 17,400 | (through 3/31/2009) |
| **Total** | **$** | **290,859** | |

(Def.'s Ex. A.)  Serricchio argues that relying on the Department of Labor statistics is

improper because it fails to capture the difficulty that he would have encountered in seeking

employment elsewhere.  Citing the language in *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231

(1982), that a mitigating plaintiff need not accept "demeaning" employment alternatives,

Serricchio maintains that this statistical evidence is too speculative and should be stricken

because it is invalid and inadmissible.  In reality, however, Serricchio did not struggle to find

other employment options because he had already decided to go ahead with the tanning

business.  By his own admission, he was taking home $60,000 or more from the business,

which is consistent with the statistical analysis assigning him earnings of between $50,000

and $70,000.

Using these figures resolves other difficulties as well.  Cunitz and Marcus offered

varying approaches to interpreting Serricchio's tax returns, but these analyses are better

suited for valuing the *tanning business itself*, rather than what Serricchio *earned* from the

business.  Even if the Court had before it an accurate valuation of what Serricchio took home

in the form of cash and other earnings starting in 2004, a proper mitigation analysis would

then have to account for the future return on his capital investments—that is, the additional

16

value that Serricchio will continue to derive from the business after no longer treating it as a full-time job.  Marcus's statistical approach further avoids the problem of how to allocate the business earnings between Serricchio and his wife, who held other employment for portions of the back-pay period.

For these reasons, the Court finds Marcus's statistical analysis to offer the most persuasive estimate of the value of Serricchio's mitigation efforts.  Accordingly, the back-pay calculation will be reduced by $290,859.

## III.    Liquidated Damages

Serricchio further seeks liquidated damages.  Pursuant to 38 U.S.C. § 4323(d)(1)(C), a prevailing plaintiff is entitled to a doubling of the back-pay award "if the court determines that the employer's failure to comply with the provisions of [USERRA] was willful."  Similar to liquidated-damages provisions in other federal statutes, an employer acts willfully under USERRA if the evidence shows that it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993); *see also Fink v. City of New York*, 129 F. Supp. 2d 511, 523–25 (E.D.N.Y. 2001) (applying the willfulness standard from the Age Discrimination in Employment Act to USERRA).

At the liability phase of the trial, Nancy Gibbons, the Wachovia manager responsible for the company's military-leave policies, testified about her understanding of obligations imposed by USERRA as follows:

> Q.      . . . [D]id you understand that returning veterans had certain rights under [USERRA]?
>
> A.      Yes, sir.

> Q.    Had you heard of [USERRA]?
>
> A.    Yes.
>
> Q.    And you knew that it conveyed rights to the returning employees, correct?
>
> A.    That is correct. . . .
>
> Q.    Did you know at that time frame that USERRA required—and I'm only asking your understanding now—did you have an understanding of whether there was any requirement that a returning veteran be promptly reinstated?
>
> A.    Yes . . . .

(Tr. 392:10–393:3, June 12, 2008.)    After some questioning about Gibbons's earlier deposition testimony, she continued:

> Q.    So when you testified at your deposition, you testified that you were aware that Mr. Serricchio was seeking reemployment, correct?
>
> A.    Yes.
>
> Q.    And you knew, at the time he was seeking reemployment, that Wachovia had an obligation to reinstate him promptly, correct?
>
> A.    Correct.

(*Id.* at 395:8–15.)  As further testimony revealed, Wachovia understood that Serricchio had a right to be reinstated to his previous position as if he had never left.  But even though Wachovia had a military-leave policy which expressly included that provision, the company did not offer Serricchio a position comparable to the one he held before leaving for military service.  Based on this and other evidence, the jury found that Wachovia had constructively discharged Serricchio.  This proof that Wachovia knew of its obligations under USERRA but did not promptly reinstate Serricchio to his previous position similarly supports a finding that Wachovia acted willfully.

18

Wachovia argues that this evidence does not translate into a finding that actions attributable to it warrant an award of liquidated damages because of the difficulty inherent in applying the terms of USERRA to a commission-based position like Serricchio's. According to its pre-trial brief: "Obviously, Wachovia was aware that Mr. Serricchio's return to employment implicated USERRA. However, that Wachovia was aware of the existence of USERRA and its application to the circumstances of Mr. Serricchio's employment does not establish that Wachovia acted willfully to violate USERRA." (Def.'s Trial Mem. [Doc. # 204] at 38.) The evidence presented in this case precludes such hair-splitting. When Serricchio returned from military service, Wachovia was a sophisticated company, employing many commission-based financial advisors like Serricchio, which had in place a written military-leave policy and a team of people responsible for dealing with military-leave issues. Gibbons, who managed that team, testified that she understood what USERRA required and recognized Wachovia's obligations with respect to Serricchio. Even assuming that USERRA's terms are subject to reasonable misinterpretation, Wachovia failed to show that it tried to comply with the law as it applies to Serricchio.

Thus, the Court finds that Wachovia willfully violated USERRA. Accordingly, Serricchio is entitled to liquidated damages

## IV.    Reinstatement

Notwithstanding the recent chaos in the financial markets, Serricchio seeks reinstatement to his financial-advisor position at Wachovia, with appropriate adjustments to his compensation, responsibilities, and status. Serricchio prefers to work in the area of Springfield, Massachusetts, but is open to other nearby geographic possibilities as well. USERRA authorizes reinstatement by permitting a court to "require the employer to comply

with the provisions of [USERRA]," 38 U.S.C. § 4323(d)(1)(A), and by also granting a court "full equity powers . . . to vindicate fully the rights or benefits" of veterans seeking reemployment, § 4323(e).   Consistent with other circuits, the Second Circuit favors reinstatement as a prospective remedy and has "repeatedly emphasized the importance of equitable relief in employment cases." *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006).

Wachovia argues that reinstatement is impracticable due to the evolution of the company's retail-securities business, the poor state of the United States economy, and the geographic preferences expressed by Serricchio.   These obstacles are not insurmountable. The first objection is not well-taken for a simple reason: owing to the jury's finding that Wachovia acted unlawfully, Wachovia cannot now disavow its responsibility for whatever difficulty Serricchio will encounter in returning to work.   And the remaining objections to reinstatement can be overcome by carefully crafting the terms of the equitable relief to be consistent with the parameters suggested by Wachovia's own witness.   (*See* Tr. 677:13–691:24, Oct. 8, 2008.)   Watson testified that Serricchio could complete his necessary licensing examinations and training in about three months.   Because he will be prohibited from advising clients and making transactions during that period, Serricchio will be entitled to a full salary for that limited time.   Over the next nine months, according to Watson, Serricchio should be able to build back up a fair book of business, during which time Wachovia shall provide him with a draw to be offset by any commissions he generates.   After a year's time, Serricchio will be responsible for managing his accounts and earning his income through commissions—a time period which corresponds to USERRA's twelve-

month reemployment right provided in 38 U.S.C. § 4316(c)(1).

Accordingly, the Court orders Wachovia to reinstate Serricchio on these terms.

V.      **Remaining Issues**

Serricchio further seeks prejudgment interest on the award of back pay and liquidated damages in order to fully compensate him for Wachovia's violations of USERRA. The Court agrees. According to the Second Circuit, "to the extent that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion *not* to include prejudgment interest." *Sharkey v. Lasmo (Aul Ltd.)*, 214 F.3d 371, 375 (2d Cir. 2000) (alterations omitted; emphasis in original). "Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993). In determining the proper measure of prejudgment interest, courts frequently use the treasury-bill rate referred to in 28 U.S.C. § 1961(a). *Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000). Accordingly, the Court finds that Serricchio is entitled to prejudgment interest on the award of damages, calculated pursuant to § 1961 and compounded annually. Inasmuch as neither party has proposed a calculation of this interest award, they shall do so no later than fourteen days after entry of judgment.

Finally, Serricchio seeks an award of attorney's fees, expert witness fees, and litigation expenses pursuant to 38 U.S.C. § 4323(h)(2). As the prevailing party, Serricchio is entitled to fees and costs, which he may detail in an application filed in accordance with Federal Rule of Civil Procedure 54(d) within fourteen days after the entry of judgment, which judgment will then be amended to include the fee award as well as the prejudgment interest.

**VI.      Conclusion**

For the foregoing reasons, the Court finds Plaintiff Michael Serricchio's damages for lost earnings to be $680,312, less his estimated mitigating earnings of $290,859, for a total back-pay award of $389,453.  The Court also awards liquidated damages in the amount of $389,453, for a total of $778,906, plus prejudgment interest calculated in accordance with 28 U.S.C. § 1961, plus fees and costs.

The Court also orders Wachovia to reinstate Serricchio, effective April 1, 2009, to a financial-advisor position with the full package of normal employment benefits in Springfield, Massachusetts, or in another geographically reasonable location.  For three months, Wachovia shall pay Serricchio a salary of $12,300 per month.  For the next nine months, Wachovia shall provide Serricchio with a draw of $12,300 per month.  After one year, Serricchio will be responsible for generating his own income through his client accounts.

The Court denies Plaintiff's motion to strike [Doc. # 222] and denies both parties' oral motions for judgment as a matter of law [Doc. ## 223, 226].  The Clerk is directed to enter judgment in favor of Michael Serricchio in the amount of $778,906, plus prejudgment interest, fees, and costs.

IT IS SO ORDERED.

                              /s/
                              Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 19th day of March, 2009.