UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Michael Serricchio,<br>     *Plaintiff,* | Civil No. 3:05cv1761 (JBA) |
|      *v.* | |
| Wachovia Securities, LLC,<br>     *Defendant.* | March 31, 2010 |

RULING ON PENDING MOTIONS

Plaintiff Michael Serricchio brought this action against his former employer Prudential Securities, Inc. and its successor, Wachovia Securities, LLC, under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, and state law.  *See generally Serricchio v. Wachovia Secs., LLC*, 556 F. Supp. 2d 99, 102–104 (D.Conn. 2008) ("*Serricchio I*") (summarizing the factual background to the case and granting in part Wachovia's motion for summary judgment).  Defendant was found liable by a jury for violating USERRA, and the Court awarded damages and equitable relief. *See Serricchio v. Wachovia Secs., LLC,* 606 F. Supp. 2d 256 (D. Conn. 2009) ("*Serricchio II*").  Defendant now moves for judgment as a matter of law [Doc. # 233] or, in the alternative, a new trial [Doc. # 237].  Plaintiff moves for attorney fees and costs [Doc. ## 243, 267].  Both parties have filed proposals directed to the issue of calculating prejudgment interest, which was left open in *Serricchio II.*

I.      Post-Trial Motions

Pursuant to Federal Rules of Civil Procedure 50(b) and 59(a), Wachovia has moved for judgment as a matter of law and, alternatively, for a new trial.  Specifically, Wachovia argues that the evidence presented at trial was insufficient to support the jury's finding that

Wachovia violated USERRA, either by failing to reemploy or by constructively discharging Serricchio. Wachovia also contends that the Court erroneously determined that Serricchio is entitled to back pay and liquidated damages. Alternatively, Wachovia seeks a new trial on the ground that portions of the jury instructions were legally erroneous.

A.      Standards

The parties appear to agree on the governing legal standards. Judgment as a matter of law in favor of Wachovia is proper only if there is no "legally sufficient evidentiary basis" on which a reasonable jury could have found for Serricchio. Fed. R. Civ. P. 50(a)(1). A Rule 50 motion should be denied unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Lavin–McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (internal citations omitted).

A motion for a new trial, brought pursuant to Federal Rule of Civil Procedure 59, "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (internal quotation omitted). Because an "erroneous [jury] instruction, unless harmless, requires a new trial," Wachovia is entitled to relief under Rule 59 if it "can show that in viewing the charge given as a whole," the errors identified in the jury instruction were prejudicial. *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

B.      Reemployment

        1.      *Motion for Judgment as a Matter of Law*

In moving for judgment as a matter of law on the USERRA reemployment claim, Wachovia argues that as of March 31, 2004, Serricchio was provided with the same guaranteed "rate of pay" that he received before going on military leave, which "overwhelmingly showed that Wachovia offered Plaintiff the position most nearly comparable to that which he would have held if not for his leave of absence, including the same status, pay and commission opportunity that he had prior to his leave." (Def.'s Mem. Supp. Mot. J. Matter of Law [Doc. # 233-1] at 5.)  Wachovia further contends that upon Serricchio's return, he "was to work as a Financial Advisor receiving a standard monthly minimum draw plus additional compensation on a 100 percent commission basis—exactly as he did before his activation.  This is all that USERRA requires; it is silent on such concepts as 'commission opportunity.'" (Def.'s Reply Mem. Supp. Mot. J. Matter of Law [Doc. # 247] at 2.)  Thus, Wachovia believes that as a matter of law, because it offered Serricchio the same draw as before he left in 2001, and because he was provided the opportunity to bring in additional compensation on a 100 percent commission basis, it cannot be held liable for failing to reemploy Serricchio in accordance with the requirements of USERRA.

Plaintiff responds that "the unrefuted trial evidence established that in the year prior to his activation for military duty, Mr. Serricchio was personally responsible for servicing in excess of 200 accounts, was responsible for managing in excess of $9 million dollars with his partner (half of which he was personally responsible for) and was earning $6,500 per month based on those assets," but if Serricchio had accepted Wachovia's reemployment offer, he "would have been managing a handful of accounts, generating, according to Wachovia's own

3

documents and expert, a small amount in monthly commissions . . . that had to be repaid to Wachovia to offset his monthly draw."  (Pl.'s Mem. Opp. Def.'s Mot. J. Matter of Law [Doc. # 238] at 7.)  According to Plaintiff, based on this evidence, the jury could have reasonably concluded that Wachovia did not reinstate Serricchio into a position with "commission opportunities" comparable to those he had when he left for military duty.

During trial, the jury heard evidence of Wachovia's offer of reemployment—consisting of providing Serricchio with a small number of accounts, a modest monthly draw that would be offset by any commission earned, and opportunities for cold-calling clients—that supports a reasonable conclusion that that offer was not comparable to the terms of his employment before going on military leave.  There was a "legally sufficient evidentiary basis" on which to conclude that, even accounting for the "escalator" principle, Wachovia's offer to reinstate Serricchio was to an inferior financial advisor position and thereby violated his reinstatement rights under USERRA.

Nonetheless, Wachovia maintains that the evidence the jury heard was insufficient for it to conclude that it violated USERRA, because as a matter of law, it was not required to provide Serricchio with comparable commission opportunities as he had before leaving for military service in 2001.  At bottom, Wachovia continues to adhere to its view that its reemployment offer to Serricchio satisfied the terms of USERRA as a matter of law, regardless of whether he had the same commission opportunities as before he left.  The Court has earlier rejected the position espoused by Wachovia that providing the same draw and commission structure to a returning servicemember is, in and of itself, sufficient to fulfill its reemployment obligations under § 4316, because Serricchio must be provided "the opportunity to reenter the workforce with comparable earning potential and chance for

4

advancement as his own book of business provided prior to his service, regardless of whether the same clients are in the substituted books." *Serricchio I*, 556 F. Supp. at 108.[1]  Whether

---

[1] The Court explained how its rationale was guided by case law applying USERRA's statutory predecessor in the analogous context of salespeople with client accounts:

In *Loeb v. Kivo*, an outside salesman of artificial flowers returned from the Second World War to find that "[t]he buyers' market which had existed" before the war "had been converted into a strong sellers' market," and thus now "customers came to the firm's office to look at samples and to place orders," obviating the need for outside salesmen as he had been, 169 F.2d 346, 348 (2d Cir. 1948).  The defendant claimed that it had no duty to reinstate Loeb because of the changed market conditions, but the Second Circuit disagreed, holding that while "[i]t is true selling had become less difficult . . . this alone would not excuse compliance with the statute," and noting that samples still had to be made up, customers needed to be dealt with, orders had to be taken, and some of the plaintiff's former clients would need servicing, *id.* at 349.  The Circuit's focus in *Loeb* was on the measures which the employer could have taken to provide Loeb with the mandated seniority, benefits, earning potential, and chance for advancement despite marked alterations in its clientele wrought by market conditions.  The Second Circuit reached a similar conclusion in *Major v. Phillips–Jones Corp.*, in which a traveling salesman returning from the Second World War requested reinstatement, was told that his pre-war territory had been assigned in his absence to another salesman, and was offered a different, more lucrative territory.  In response to Major's claim to be entitled to his old sales territory by law, the Circuit held that the plaintiff "misconceive[d] his rights" when he insisted upon his old territory, and concluded that § 4316(a) "in no way requires reinstatement of the veteran to his former position but only that he be given a position of equal seniority, status, and pay" to that which he would have had if not for his period of service, 192 F.2d 186, 188 (2d Cir. 1951).  The district court's directed verdict in favor of the defendant was affirmed because the defendant had offered Major a territory which exceeded the opportunities of his former one.

Additional guidance on the scope and nature of an employer's reinstatement duty to returning veterans is found in *Schwetzler v. Midwest Dairy Products, Inc.*, in which the Seventh Circuit affirmed dismissal of a veteran's suit where the veteran had returned home from the war and had been offered an

the offered reinstatement terms satisfied USERRA's requirements was found to be a triable

issue, explained in the ruling denying Wachovia's summary judgment motion as to the

USERRA reemployment claim:

> The parties dispute whether the arrangement offered Serricchio upon his
> return fulfilled [Wachovia's] duty [under USERRA].  Serricchio claims that
> the Defendant could have assembled for him a new, comparable book of
> business by taking a few accounts from each of the other financial advisors
> in the office.  Wachovia claims that its offer sufficed.  This factual dispute will
> be left to the province of the jury for determination of whether Wachovia has
> met its § 4316(a) burden.

*Serricchio I*, 556 F. Supp. 2d at 108.  Consistent with the Court's previous conclusion that

whether Wachovia violated USERRA by not providing Serricchio with comparable

commission opportunities was a jury issue, Wachovia's motion for judgment as a matter of

law that it was not obligated to provide such opportunities under USERRA is denied.

---

> alternative soft drink sales route comparable to his old route, which had been
> assigned to someone else during his time overseas.  Holding that the plaintiff
> was merely entitled to "be given [his former] position or a comparable one,"
> the court concluded that the route offered "afford[ed] comparable
> opportunities as to seniority, status, and pay," and thus, that the defendant
> had discharged its statutory duty, 174 F.2d 612, 612–613 (7th Cir. 1949).

*Serricchio I*, 556 F. Supp. 2d at 107–08.

### 2.    Motion for New Trial

Alternatively, Wachovia argues that it is entitled to a new trial because the Court's "Reinstatement" instruction was an incomplete and thus a misleading statement of the law.[2] Specifically, Wachovia charges that the Court:

> (i) failed to define "reasonable certainty" as specified in 20 C.F.R. § 1002.213; (ii) failed to include an instruction on the permissibility of lawful adverse job consequences, or the "downward escalator" principle in accordance with 20 C.F.R. § 1002.194; (iii) failed to define "rate of pay" in accordance with 20 C.F.R. § 1002.236; and (iv) failed to distinguish between seniority and non-

---

[2] The Court charged the jury on reinstatement as follows:

Under USERRA, an employer is required to reemploy a returning service member in the position with the same seniority, status, and pay which the person would have been employed in if his or her employment had not been interrupted by military service, or to a comparable position of like seniority, status, and pay.  To prove that Wachovia violated this USERRA requirement, Serricchio must prove that Wachovia failed to reinstate him to a position which, at the time the position was offered, reflected with reasonable certainty the pay, benefits, seniority, and other job perquisites that he would have attained if not for the period of his military service (the "escalator position"), or a position comparable to the "escalator position," or to his pre-service position, or to a position which was the nearest approximation to any of these positions.

Whether the reinstatement position offered complies with USERRA's requirement is not determined solely by the title, but by whether it is a position with the same or comparable seniority, status and pay which the plaintiff would have had at Wachovia, absent military leave.  Wachovia was not required to provide Serricchio his exact previous book of business, so long as what it offered him gave him the opportunity to reenter the workforce with the comparable status and commission opportunity as of the date of reinstatement that he would have had if he had not taken military leave, regardless of whether the same clients were in his substituted book of business provided on his return.

(Jury Instructions [Doc. # 172] at 9.)

seniority based benefits with reference to Plaintiff's compensation, as provided for in 20 C.F.R. § 1002.193.

(Def.'s Mem. Supp. Mot. J. Matter of Law at 26.)  For the reasons that follow, Wachovia has not demonstrated that the charge as given was prejudicial and permitted the jury to reach an erroneous result.

First, there is no clear distinction between the phrase "reasonable certainty" used in the instruction and the phrase "high probability" used in 20 C.F.R. § 1002.213, which Wachovia contends should have been in the instruction to define it.  Indeed, Wachovia does not offer any distinction other than to argue that the latter clarifies the former, and it offers no compelling analysis as to how the jury was misled by not including the additional definitional term in the charge.  Second, Wachovia asserts that the Court's decision not to explicitly instruct the jury on the "two-way escalator provision" "impress[ed] upon the jury that the only sufficient position to which Wachovia could reinstate Plaintiff was one equal to or greater than the position he held prior to his leave."  (Def.'s Mem. Supp. Mot. J. Matter of Law at 28.)  Beyond that, Wachovia offers no other explanation of how the Court's instruction,[3] which was neutral as to "escalator" direction, confused or misled the jury.

---

[3] The Court instructed the jury that:

Mr. Serricchio must prove that Wachovia failed to reinstate him to a position . . . that he would have attained if not for the period of his military service (the 'escalator position'), or a position comparable to the 'escalator provision' . . . .  Wachovia was not required to provide Mr. Serricchio his exact previous book of business, so long as what it offered him gave him the opportunity to reenter the workforce with the comparable status and commission opportunity as of the date of reinstatement that he would have had if he had not taken military leave, regardless of whether the same clients were in his

Third, in the jury charge, the Court explained what "seniority, status, and pay" meant, clarifying that Wachovia was obligated to offer Serricchio reinstatement with "comparable status and commission opportunity"—itself the product of a suggestion by Wachovia's counsel—to account for the fact that Serricchio's income was derived from commissions rather than regular salary.  And fourth, the Court's decision not to instruct the jury that a book of business is a seniority-based benefit under USERRA would have been meaningless given the Court's instruction that Wachovia was not obligated to preserve Serricchio's exact book of business.  Taking the challenged instruction as a whole, Wachovia has not shown that the Court's language was legally erroneous or that it misled the jury.  Therefore, Defendant's motion for a new trial on Serricchio's USERRA reemployment claim is denied.

      C.    Constructive Discharge

Second, Wachovia argues that the jury erred by returning a verdict in favor of Serricchio on his constructive–discharge claim.  Wachovia maintains that there was no evidence in the record that it "*intentionally* dissipated Plaintiff's book of business so as to leave him no choice but to resign."  (Def.'s Mem. Supp. Mot. J. Matter of Law at 3.)  On this point, the Court instructed the jury as follows:

> USERRA prohibits an employer from terminating a returning employee's reinstated employment for one year after he or she returns, except where an employee is terminated "for cause."  Serricchio claims that he was constructively discharged as a result of Wachovia's reinstatement offer, even though not expressly discharged.  To prove that he was constructively discharged, Serricchio must prove by a preponderance of the evidence that the defendant, rather than discharging him directly, created a work atmosphere so intolerable that Serricchio was forced to quit involuntarily.

---

substituted book of business provided on his return.

(Jury Instructions at 9)

9

> The plaintiff must prove that Wachovia's actions were intentional or deliberate and were more than merely negligent. Serricchio must also prove that a reasonable person in his position would have found the working conditions he faced to have been so intolerable or unendurable that that person would have felt compelled to resign.

(Jury Instructions [Doc. # 172] at 10.)  While no direct evidence of Wachovia's wrongful intent was presented at trial, as Defendant emphasizes, the jury heard circumstantial evidence of it, including Wachovia's unexplained, lengthy delay in offering to reinstate Serricchio.  It did not offer reinstatement until the end of March 2004, even though he first notified Wachovia of his intention to return in April 2003 and again in December 2003.  It also heard testimony from Nancy Gibbons, Wachovia's expert on its leave policy, that Wachovia ostensibly maintained a generous military–leave policy applicable to returning veterans, and there was no reason for the delay in reemploying Serricchio.  In addition, as discussed above, evidence was presented that Serricchio was offered reinstatement in an inferior position than he had had before he left for military service on which he could not have supported his family, even if his draw would have been the same, particularly where Wachovia had changed the structure of Serricchio's role as financial advisor and altered its business model from transaction–based to fee–based, leaving him to do "cold calling," which he had not done since his early days as an employee of Defendant.  Further, there was evidence that Serricchio's supervisor, Lawrence Meyers, was dissatisfied with his accounts and froze them before his return.  Meyers testified that he knew that Serricchio would be unable to support himself and his family on the monthly draw and minimal commissions generated by remaining accounts.

It is true that the jury also had to weigh the evidence that Serricchio's book of business began to decline before he went on military leave, some of his accounts were

appropriated by former partners when they left for other banks, the transfer of accounts to the National Call Center was a company–wide initiative, Wachovia offered Serricchio those accounts that still existed upon his return that he managed at the time of his departure, and Serricchio's efforts to develop his own tanning salon business.  Nonetheless, Defendant's stone–walling and desultory efforts to set Serricchio back up at Wachovia upon his return were sufficient for the jury to conclude that Defendant was more than negligent in giving Serricchio a reinstatement offer that a reasonable person could regard as financially precarious and professionally degrading.  This forms an adequate basis for the jury's finding Defendant liable for constructive discharge.

D.    Damages

Finally, Wachovia challenges the Court's opinion following the bench trial on damages, contending that Serricchio failed to mitigate his damages and that liquidated damages are not warranted on this record.  Specifically, Wachovia argues that Plaintiff's choice of self-employment (the tanning salon business) was not reasonable mitigation, because Serricchio did not first exercise reasonable diligence to secure alternative employment in his field.  Wachovia also argues that the Court "did not adequately address the issue of willfulness, which is a prerequisite to a liquidated damages award." (Def.'s Mem. Supp. Mot. J. Matter of Law  at 21.)  The Court fully considered and ruled on these issues in its damages opinion.  First, the Court determined that Serricchio satisfied his duty to mitigate his damages:

> On the question of whether the Plaintiff satisfied his duty to mitigate damages or whether he should be barred from any recovery, Serricchio points to his efforts to succeed as the owner of a small business.  Whether or not the venture generated equivalent earnings to his work as a broker, he argues, the dedication to expanding and reinvesting in the business shows

11

> that he adequately pursued other employment opportunities when Wachovia failed to reinstate him.  The Court finds that pursuing this course of action, rather than accepting a lower-paying position at Wachovia or seeking other employment in the finance sector, was consistent with Serricchio's duty to mitigate his losses.  As the Seventh Circuit noted in *Smith v. Great American Restaurants*, "[t]he notion that starting one's own business cannot constitute comparable employment for mitigation purposes not only lacks support in the cases, but has a distinctly un-American ring."  969 F.2d at 438.  Thus, while the business may not have been immediately lucrative, Serricchio's efforts as a business owner do not, as a matter of law, constitute insufficient mitigation.   Accordingly, the Court rejects Wachovia's defense that Serricchio failed to mitigate altogether.

*Serricchio II*, 606 F. Supp. 2d at 264–65; *see also id.* at 262–63 (summarizing the legal principles governing mitigation).   Wachovia's motion raises no new arguments not considered in the Court's analysis of the sufficiency of Serricchio's self-employment for mitigation purposes.

Second, the Court determined that Serricchio was entitled to double damages based on the proof that Wachovia's agents acted willfully.  Similar to liquidated–damages provisions in other federal statutes, an employer acts willfully under USERRA if the evidence shows that it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993); *see also Fink v. City of New York*, 129 F. Supp. 2d 511, 523–25 (E.D.N.Y. 2001) (applying the willfulness standard from the Age Discrimination in Employment Act to USERRA).  In determining that Wachovia acted willfully, the Court considered Gibbons' testimony at trial, which revealed that "Wachovia understood that Serricchio had a right to be reinstated to his previous position as if he had never left. But even though Wachovia had a military–leave policy which expressly included that provision, the company did not offer Serricchio a position comparable to the one he held before leaving for military service."  *Serricchio II*, 606

F. Supp. 2d at 266.  Considering Gibbons' testimony that she "knew of [the company's] obligations under USERRA but did not promptly reinstate Serricchio to his previous position," the Court addressed the same argument Wachovia raises here:

> Wachovia argues that this evidence does not translate into a finding that actions attributable to it warrant an award of liquidated damages because of the difficulty inherent in applying the terms of USERRA to a commission-based position like Serricchio's.  According to its pre-trial brief: "Obviously, Wachovia was aware that Serricchio's return to employment implicated USERRA.  However, that Wachovia was aware of the existence of USERRA and its application to the circumstances of Serricchio's employment does not establish that Wachovia acted willfully to violate USERRA."  (Def.'s Trial Mem. [Doc. # 204] at 38.)   The evidence presented in this case precludes such hair-splitting.   When Serricchio returned from military service, Wachovia was a sophisticated company, employing many commission–based financial advisors like Serricchio, which had in place a written military–leave policy and a team of people responsible for dealing with military–leave issues. [Nancy] Gibbons, who managed that team, testified that she understood what USERRA required and recognized Wachovia's obligations with respect to Serricchio.   Even assuming that USERRA's terms are subject to reasonable misinterpretation, Wachovia failed to show that it tried to comply with the law as it applies to Serricchio.

*Id.* at 265–66.

Based on evidence that Wachovia knew well its obligations to Serricchio under USERRA and knew he sought reinstatement, but nonetheless unreasonably failed to offer it to him timely or with more than minimal effort toward compliance,[4] the Court determined Wachovia acted willfully.

---

[4] Gibbons, the Wachovia manager responsible for military–leave policies, testified that she knew USERRA required Serricchio's prompt reinstatement to a position comparable to that which he would have held had he never left for military service. (Tr. 392:10–393:3, 395:8–15, June 12, 2008.)   She also testified that she knew Serricchio requested such reinstatement.  As discussed above, the jury determined that Serricchio was not reinstated to a comparable position, in violation of USERRA's requirements.

II.    Prejudgment interest

The Court awarded Serricchio prejudgment interest on back pay and liquidated damages to compensate him fully for Wachovia's violations of USERRA.  At the Court's request, the parties submitted proposals for calculating this prejudgment interest [Docs. ## 240, 241].

The parties agree that an appropriate measure of applicable interest rates is that set by 28 U.S.C. § 1961(a), governing post-judgment interest, which calls for application of the "weekly average 1–year constant maturity Treasury yield."  The parties disagree, however, as to which period of time the Treasury yield should be drawn from to make this calculation. Wachovia points to Section 1961(a), which provides that "interest shall be calculated from the date of entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment" and maintains that the applicable rate for the period between the injury and judgment should be the rate for the week preceding the Court's ruling, or 0.70 percent.  Serricchio contends that a better measure of prejudgment interest is an "average interest rate [calculated] by (i) adding the weekly rate for each week and (ii) dividing by the number of weeks."  (Pl.'s Prop. Calc. Prejudgment Interest [Doc. # 241] at 2.)

Prejudgment interest is "an element of complete compensation" that "serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."  *West Virginia v. United States*, 479 U.S. 305, 310–11 (1987). However, "[t]here is no federal statute that purports to control the rate of prejudgment interest."  *See Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000).  While

14

the 1–year constant maturity Treasury yield provides an accurate rate at a given point in time, applying only the rate for the week preceding judgment fails to account for the significant rate fluctuations over the previous six years, ranging from 5.27 percent in July 2006 to 0.37 percent in January 2009. Wachovia's focus on the timing of Section 1961(a) overlooks the fact that it is directed to *post*-judgment interest, defining the rate to be applied from the date of judgment forward to when it is enforced. To calculate the interest that Plaintiff could have earned on income he should have received between December 2003 and March 2009, the Court will use an average of the rates he could have received on money during that period, as Plaintiff proposes.

Plaintiff's methodology and calculation for this annual average of 1–year constant maturity Treasury yield rates is unchallenged and will be adopted.[5] The judgment will thus be increased by $36,567.98 in prejudgment interest accruing on back pay between December 18, 2003 and March 20, 2009.

III.    Attorneys Fees

In *Serricchio II*, the Court recognized that Serricchio is entitled to fees and costs pursuant to 38 U.S.C. § 4323(h)(2). Serricchio's application for attorneys' fees and costs and seeks an award of $850,579 for over 2,000 hours of attorney and paralegal time and an award of $118,074.05 in litigation expenses incurred (Pl.'s Mem Supp. Appl. [Doc. # 244] at 1), supplemented by an additional $59,077.50 in fees and $981.31 in costs incurred in

---

[5] This methodology uses the average 1–year constant maturity Treasury yield rates for each year, or fraction of a year, following Plaintiff's constructive discharge to date of judgment. Those average annual rates are multiplied by "earning less mitigation" for each year and compounded annually. Each year's interest accrued is then divided by two, to reflect that the amount awarded would have been earned over the course of the year and not as one lump sum.

responding to Defendant's Memorandum of Law in Opposition to Plaintiff's initial application for fees and costs (Pl.'s Reply and Suppl. Appl. [Doc. # 267]), for a total of $1,028,711.86. Wachovia has opposed Serricchio's application, claiming that the hourly rates he seeks to compensate his attorneys and the number of hours they have billed are both unreasonably high.

A.    Hourly Rates

Plaintiff seeks fees at rates of $550 per hour for Attorney David Golub's time, $450 per hour for Attorney Jonathan Levine's time; $350 per hour for Attorney Craig Yankwitt's time; and $150 per hour for Paralegal Martha Jackson's time.  Wachovia argues that each of these rates is significantly greater than any prior rate used in this District and that any rate "exceeding $325 for David Golub, $250 for Jonathan Levine, $175 for Craig Yankwitt, and $70 per hour for Martha Jackson would be facially unreasonable for this New Haven, Connecticut proceeding." (Def.'s Mem. Opp. Pl.'s Appl. Fees [Doc. # 249] at 16.)

In *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 493 F.3d 110 (2d Cir. 2007) ("*Arbor Hill I*"), *amended on other grounds*, 522 F.3d 182, 184 (2d Cir. 2008) ("*Arbor Hill II*"), the Second Circuit moved away from the "lodestar" approach to attorneys fees, which multiplies an attorney's hourly rate and the number of hours he or she worked and adjusts the result, if necessary, to arrive at a reasonable fee award, instead adopting a case-specific approach for determining a reasonable fee to award.  The Second Circuit instructed district courts to "step[] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively" in considering "what a reasonable, paying client would be willing to pay."  *Id.* at 184.  To do this, the Court should utilize both the factors articulated in *Johnson v. Georgia Highway Express, Inc.*, 488

16

F.2d 714 (5th Cir. 1974), *abrogated on other grounds, Blanchard v. Gergeron*, 489 U.S. 87,

92–93 (1989),[6] as well as certain client–related factors:

> the district court, in exercising its considerable discretion, [should] bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate.  The reasonable hourly rate is the rate a paying client would be willing to pay.  In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.  The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

*Arbor Hill I*, 493 F.3d at 117–18.  Additionally, "'a reasonable hourly rate' is not ordinarily

ascertained simply by reference to rates awarded in prior cases.  Recycling rates awarded in

prior cases without considering whether they continue to prevail may create disparity

between compensation available [in a fee award] and compensation available in the

marketplace." *Farbotko v. Clinton County of New York*, 433 F.3d 204, 208–09 (2d Cir. 2005).

Nonetheless, Wachovia argues that these factors do not weigh in favor of departing from the

---

[6] The *Johnson* factors include (1) the time and labor required by an attorney; (2) the novelty and difficulty of the questions presented by the litigation; (3) the level of skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney because of acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

hourly rates awarded in cases in the District of Connecticut in early 2007 and before.[7]

It is undisputed that this case required significant expenditures of time and labor. Counsel for both parties marshaled substantial resources to contest issues at every stage. Additionally, although this case is fundamentally a single–plaintiff employment dispute, it is hardly "straightforward," as Defendant characterize it; it appears to be the first USERRA case in the District of Connecticut to go to a jury verdict, and Plaintiff's attorneys secured a very favorable result for him, particularly on difficult issues like constructive discharge and financial advisor position comparability.[8] The Retired Officers Association, a veterans group

---

[7] Wachovia cites to District of Connecticut cases including *Piurkowski v. Goggin*, No. 3:01cv302(SRU), 2004 U.S. Dist. LEXIS 12656, at * 10 n. 5 (D. Conn. July 6, 2004) (recognizing that between $250 and $300 an hour is a reasonable rate for an attorney with a great deal of expertise his or her field); *Accel Int'l Corp. v. Renwick*, No. 3:03cv983 (RNC), 2004 U.S. Dist. LEXIS 3979, at * 7 (D. Conn. Mar. 8, 2004) ("Based on the reported decisions, it appears that hourly rates awarded in this district have not exceeded $275 for highly experienced attorneys, or $175 for associates."); *Blumenschine v. Prof'l Media Group, LLC*, No. 3:02cv2244 (HBF), 2007 WL 988192, at * 19–20 (D. Conn. Mar. 30, 2007) (reducing lead partner's hourly rate in age and sex discrimination litigation to $300 per hour); *Otero v. Colligan*, No. 3:99cv2378 (WIG), 2006 U.S. Dist. LEXIS 44001, at * 15–16 (D. Conn. June 28, 2006) (setting hourly award for attorney with over 30 years experience in employment and civil rights litigation at $275 per hour); *Sabir v. Jowett*, 214 F. Supp. 2d 226, 251 (D. Conn. 2002) (concluding that $275 per hour rate was reasonable for civil rights attorney); *Howell v. New Haven Bd. of Educ.*, No. 3:02cv726 (JBA), 2005 WL 2179582, at * 11 (D. Conn. Sep. 8, 2005) (awarding $300 per hour for attorney with more than three decades experience in civil rights litigation).

[8] That Plaintiff voluntarily abandoned certain claims and did not prevail on his state law claims does not materially diminish the overall successful results obtained by his counsel. When a case, such as this one, has multiple claims that arise from "a common core of facts" or that are "based on related legal theories," "the district court should focus on the significance of the overall relief obtained by the plaintiff . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *see also Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) ("Attorney's fees may be awarded for unsuccessful claims as well as successful ones . . . where they are inextricably intertwined and involve a common core of facts or are based on related legal theories.") (internal citations omitted).

that provides assistance in bringing USERRA claims, reported at the time of judgment that it was the largest recovery ordered under USERRA.  (Pl.'s Mem. Supp. Appl. at 7.)

Additionally, Plaintiff's counsel are experienced in employment matters and have strong credentials.[9]  Plaintiff has attached several affidavits to his fee application from attorneys in Connecticut,[10] each of whom avers that he is familiar with David Golub in particular and lauds Golub's work as a premier trial attorney in Connecticut.  Golub graduated from Yale Law School in 1973 and "has taken, and prevailed and settled, some of the most difficult employment cases which have been litigated in Connecticut."  (Garrison Aff., Ex. A to Pl.'s Mem. Supp. Appl. at ¶ 5.)  Levine, a 1990 graduate of Yale Law School, has practiced law for nineteen years, the last nine of which he has spent as a partner at Silver, Golub, & Teitell, LLP.  According to Golub, Levine has worked with him on many employment matters.[11]  (Golub Decl. [Doc. # 245] at ¶ 17.)  Finally, Yankwitt has practiced at Silver, Golub, & Teitell, LLP for five years, before that clerking in the District of Connecticut for Judge Underhill.  Yankwitt is now the senior associate at Silver, Golub &

---

[9] Wachovia does not dispute the experience of Plaintiff's counsel but argues that experienced attorneys in the District of Connecticut have been awarded lower hourly rates than requested here, citing cases from 2004 through 2006 including *Piurkowsk*, *Otero*, and *Howell*.

[10] Defendant does not challenge these affidavits provided by Plaintiff.  Rather, Wachovia argues that "the opinions of the declarants/affiants should be disregarded as unreliable compared to the substantial case law establishing that [Plaintiff's attorneys'] rate[s] exceed[] that typically awarded."  (Def.'s Mem. Opp. Pl.'s Appl. at 13.)

[11] Golub refers to *Peckinpaugh v. Post–Newsweek Stations Connecticut, Inc., et al.*, No. 3:96cv2475(AVC) (D. Conn); *Dowie v. Exxon Corp.*, No. B–83–468(TFGD) (D. Conn.); *Sharkey v. Lazmo Corp.*, No. 94cv4699(WCC) (S.D.N.Y.); *Christiansen v. Conopco, Inc.*, No. 5:92cv727(AHN) (D. Conn.); *State Employees Bargain Agent Coalition, v. Rowland*, No. 3:03cv221(AVC) (D. Conn.).

Teitell, LLP and according to Golub "has had individual case responsibility for numerous cases and, in addition, has worked with me and others in my firm in preparing and litigating substantial cases, including a number of substantial and complex employment–related cases." (*Id.*) This fee application details their numerous successful employment cases. (Pl.'s Mem. Supp. Appl. at 18–20.)

Defendant correctly observes that the rates claimed to be charged by Plaintiffs' counsel exceed the highest hourly rates awarded to date in Connecticut. *See M.K. v. Sergi*, 578 F. Supp. 2d 425, 427 (D. Conn. 2008) (collecting cases; of the cases analyzed, $400 per hour was the highest rate awarded and was awarded for experienced counsel in complex matters, including antitrust, patent, and breach of contract actions); *Pappas v. Watson Wyatt & Co.*, No. 3:04cv304 (EBB), 2008 WL 45385 at *3 (D. Conn. Jan. 2, 2008) (awarding counsel in Title VII action fees at $400 per hour based on her experience, even though "most New Haven firms specializing in defending employment suits bill partners' time at a rate of at least $350 per hour"). The $550 per hour rate sought by Golub may also be at the highest hourly rate for attorneys who represent employees in the Connecticut. (Garrison Decl. at ¶ 7.) However, the attorney affidavits submitted give indication that market rates for highly experienced, successful, specialized counsel have increased since 2008.

On the other hand, the rates Plaintiff's lead counsel charges, at the top of the range of Connecticut employment attorneys likely would cause a reasonable client to experience "sticker shock" and to seek to negotiate a lower fee, particularly given the prospect of full-blown litigation. Additionally, because this appears to be one of the first USERRA cases in the District, a savvy client would recognize potential leverage to negotiate a lower fee from the reputational benefits that would accrue to Plaintiff's counsel for taking on this

representation since a successful outcome potentially would attract many other returning service–members seeking representation in enforcing their USERRA rights. Therefore, in considering what a "presumptively reasonable fee" is in this case, the Court will reduce the hourly rates sought to reflect these factors.

Because of Golub's extensive experience, high reputation, and remarkably successful results, and to reflect the reality of rate increases over time, an hourly rate above any reported hourly rate is appropriate. Given the current rates charged by other practicing attorneys of long experience in their fields of specialization; Golub's lengthy experience as a successful litigator; his expertise in employment matters; the novelty and complexity of this matter as the first USERRA case to be tried in the District; the four years that have elapsed since courts in this District first awarded attorneys fees at $400 per hour, *see Sony Elecs., Inc. v. Soundview Techs., Inc.*, 389 F. Supp. 2d 443, 448 (D. Conn. 2005); and the Second Circuit's instruction not to just recycle rates, *see Farbotko*, 433 F.3d at 208–09, a rate of $465 per hour is reasonable for Golub's time.[12]

Levine is also experienced, with expertise in employment matters. In *Pappas*, 2008 WL 45385 at * 5, Judge Burns awarded fees at a rate of $400 per hour for a similarly experienced lead counsel in a Title VII employment discrimination case who had specialized in the field of employment since the early 1990s and reported regularly billing clients at a rate of $450 per hour. Given the similarity of that attorney's background, some passage of time, and considering what a reasonable client would expect to pay, a rate of $410 per hour is reasonable for Levine.

---

[12] Defendant's proposed rates are based on awards given between 2003 and 2006 (Def.'s Sur-Reply [Doc. # 276] at 5–8), three years ago at a minimum, and not reflective of rates regularly awarded today in the District.

Yankwitt is an associate with more than five years experience in practice and federal clerkship experience. In *Home Funding Group, LLC v. Kochmann*, No. 3:06cv1234(HBF) (D. Conn. Sept. 18, 2008), Magistrate Judge Fitzsimmons awarded a plaintiff in an employment breach of contract action fees for the services provided by an associate with comparable experience to Yankwitt, at a rate of $280 per hour. In light of the rate applied in the *Kochmann* award, Yankwitt's typical billing rate, and his experience and credentials, $300 per hour is an appropriate rate to use in calculating his fee award.

Plaintiff requests that the Court credit Jackson, the paralegal who supported the attorneys, at $150 per hour. In *Tolnay v. Wearing*, No. 3:02cv1514(EBB), 2007 WL 2727543 (D. Conn. Sept. 19, 2007), Judge Burns awarded fees at a rate of $125 per hour for a paralegal who had a law degree and who had requested $165 per hour. In *Dinoto v. Rockland Financial Mtg. Co., LLC*, No. 3:06cv1132(MRK), 2007 WL 2667318 (D. Conn. Aug. 21, 2007), Judge Kravitz adopted a recommendation by Magistrate Judge Garfinkel that fees be awarded for the paralegal's hours at $120 per hour, a reasonable rate given that the paralegal had thirty years experience and that a 2001 Central Connecticut Paralegal Associate publication reflected that 25 percent of paralegals in Connecticut were billed to clients at between $111 per hour and $130 per hour. Here, although Jackson does not have a law degree, she has worked as a paralegal for over twenty-one years. (Golub Decl. at ¶ 14.) Considering this experience as a litigation paralegal, and three years passage of time since *Dinoto*, the Court will use an hourly rate of $130 per hour as the rate to be applied to Jackson's work.

B.      Number of hours billed

In support of Serricchio's motion for attorneys fees and costs, Plaintiff's counsel submitted a schedule of the time expended by Silver, Golub & Teitell, LLP in its litigation of this matter (*See* Billing Schedule, Ex. A. to Golub Decl), supplemented their fees and costs incurred in litigating the attorneys fees and costs dispute [Doc. # 267].  Wachovia responds that the hours claimed by Plaintiff's counsel are excessive or not compensable.  "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded" from a fee award.  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (citing *Hensley*, 461 U.S. at 434).

1.      Depositions

Defendant argues that "the time records submitted by Plaintiff's counsel reveals excessive and often duplicate billing for the taking of depositions."  (Def.'s Mem. Opp. Pl.'s Appl. at 17.)  Defendant notes that Plaintiff's counsel submits that they spent 141.25 hours preparing for four depositions (of Carson Coyle, Joseph Zinicola, Andrew Lippman, and Paul Marcus), which Defendant argues is excessive.  Defendant also argues against any award for Plaintiff's depositions of Amy Bernard, Jeffrey Potter, Kjersten Kinston–Lazar, and Kenneth Rotondo, who purportedly only had "trivial involvement" with the dispositive facts of the case, amounted to nothing more than a "fishing expedition."  (*Id.* at 19–20.)

In preparing for and taking the depositions of Coyle, Zinicola, Lippman, and Marcus, Yankwitt spent 115 hours, Golub spent 13.5 hours, and Levine spent 12.75 hours.  Citing Federal Rule of Civil Procedure 30(d)(1), which limits the duration of a deposition to seven hours unless otherwise stipulated or ordered by the Court, Defendant proposes that the Court should only award Plaintiff eight hours on the date of each deposition and eight hours

of preparation time for each deponent, for a total of 64 hours.[13]  For support, Defendants cite

to *Massaro v. Allington Fire District*, No. 3:02cv537(PCD), 2003 WL 22305125 (D. Conn.

Aug. 2, 2003), in which hours sought for deposition preparation were reduced where there

was no evidence of how time was spent preparing for depositions or even which attorneys

were involved in preparation.[14]  Yet unlike in *Massaro*, Plaintiff's counsel has provided

evidence of how time was spent preparing for depositions.  For Coyle's deposition, Yankwitt

avers that in addition to the 16 hours spent preparing for the first day of the deposition, he

was required to analyze in detail "substantial new account documents and summaries"

disclosed by Defendant prior to the second day of the deposition, which required 17.5 hours.

(Yankwitt Decl. [Doc. # 266] at ¶ 7.)  Yankwitt spent only 4.5 hours preparing for the

Zinicola deposition, Golub spent 1.5 hours in preparation, and Levine spent a total of 9.25

hours preparing for and taking the Zinicola deposition, which are reasonable amounts of

preparation time.  Yankwitt avers that he and Golub needed 18 hours of preparation time

for Lippman's 16–hour deposition because they had to conduct a detailed analysis of

---

[13] Defendant do not suggest how those hours should be allocated among the three attorneys preparing for and taking depositions for Plaintiff.

[14] Defendant also cited to cases in which district courts did not award total hours sought as costs for expert witnesses to prepare for their own depositions.  *See Mannarino v. United States*, 218 F.R.D. 372, 376 (E.D.N.Y. Oct. 28, 2003) (reducing hours awarded from eight to four for expert who testified that he had not reviewed any materials not already relied upon in drafting his expert report—drafted "only a few months prior to the deposition"— because the court determined that he was familiar enough with the issues that he did not need eight hours to prepare for what was anticipated to be a three hour deposition in a case in which the issues "are not complex"); *Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*, No. 93cv5481 (LBS) (AJP), 1999 WL 32909 (S.D.N.Y. Jan. 21, 1999) (reducing hours of preparation time for expert from 23 hours to 13 hours where no other expert billed for more than nine hours of preparation time).

computer reports generated by the witness and had to compare prior, inconsistent summaries produced by defense counsel with thousands of account documents that formed the basis for Lippman's computer–generated data.  (*Id.* at ¶ 9.)  Finally, Yankwitt explains that 26.75 hours of preparation for the deposition of Marcus, Wachovia's damages expert, were spent analyzing his 26–page report on damages, which included five separate and distinct damage calculations and was prepared at an expense of $80,000.  (*Id.* at ¶ 10.)  The Court concludes that Plaintiff's counsel have provided adequate justification for the time they spent preparing for depositions of Coyle, Zinicola, Lippman, and Marcus, and the Court will credit those hours in full.

Next, Wachovia claims that no fees should be awarded for time spent by Plaintiff's counsel on the depositions of Bernard, Potter, Keniston–Lazar, and Rotondo, "who ultimately were only tangentially involved in the case" (Def.'s Mem. Opp. Pl.'s Appl. at 19), relying upon *Electronic Specialty Co. v. International Controls Corp.*, 47 F.R.D. 158, 162 (S.D.N.Y. 1969) ("[C]osts incurred for depositions which are merely fishing expeditions and only for the convenience of counsel in marshaling his case, as distinguished from a necessity for use in the solution of issues of the case, are not allowable.").  To the extent that *Electronic Specialty*—which dealt with whether the cost of taking depositions is taxable under 28 U.S.C. § 1920—is applicable, it also held that the proper inquiry is whether a deposition "appeared to be reasonably necessary . . . *at the time it was taken.*"  *Id.* (emphasis in original); *see also Anderson v. City of New York*, 132 F. Supp. 2d 239, 246 (S.D.N.Y. 2001) (same).[15]

---

[15] Defendant also cites *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 304 (S.D.N.Y. 2001), which addresses both whether the costs of depositions are taxable under 28 U.S.C. § 1920 and whether plaintiffs could recover deposition costs under New York Local Rule 54.1(c)(2), two issues that do not bear on this fee application.

Bernard, Potter, Keniston–Lazar, and Rotondo were all designated by Defendant as witnesses under Federal Rule of Civil Procedure 30(b)(6), with knowledge of "the policies, procedures, practices and application of [USERRA] to employees of [Wachovia], including financial advisors or analysts who were activated to military service for six months or longer after September 2001"; and "the efforts [Wachovia] made to protect plaintiff's rights under USERRA during and after Plaintiff's activation." (June 29, 2007 e-mail from Devjani Mishra to Craig Yankwitt, Ex. E. to Yankwitt Decl.; Yankwitt Decl. at ¶ 11.)  In addition, Bernard, Keniston–Lazar, and Rotondo were identified by Defendant in their Rule 26 initial disclosures.  (*Id.*)  Bernard (who later changed her name to Layton) was identified as someone who "may have information concerning Wachovia's military leave of absence policy;" Keniston–Lazar was identified as someone who "may have information concerning the servicing of certain accounts during Plaintiff's military leave of absence;" and Rotondo was identified as someone who "may have information concerning Wachovia's efforts to reinstate Plaintiff's employment following his return from active military duty." (*Id.*)  Thus, Plaintiff's counsel did not conduct a "fishing expedition"; rather, they conducted depositions that they reasonably believed to be necessary at the time.  Defendant does not challenge the requested hours for those awards on any other basis, and they will be credited in full.

### 2. *Mediation Statement*

Defendant next contends that Plaintiff's counsel expended excessive time (74.5 hours for Yankwitt, 8.75 hours for Golub) preparing a mediation statement prior to the parties' unsuccessful May 29, 2008 JAMS mediation; they claim that Plaintiff's mediation statement was "primarily a recitation of facts and a 'copy and paste' of Plaintiff's expert's damages analysis" and "largely mirror Plaintiff's opposition to Wachovia's motion for summary

judgment.  (Def.'s Mem. Opp. Pl.'s Appl. at 20–21.)  Defendant also notes that the time entries for work done by Plaintiff's counsel on the mediation statement are vague; the entries each describe the work done on the statement as "Prep Mediation memo."[16]

Plaintiff's counsel respond that they spent "considerable time with plaintiff's damages expert developing five different damages models to be presented and considered at the mediation." (Pl.'s Reply Mem. and Suppl. Appl. [Doc. # 275] at 15.)  Because the parties entered into a confidentiality agreement with JAMS that precludes disclosure of their mediation statements, the Court cannot determine whether Plaintiff's mediation statement mirrors his opposition to summary judgment and is a copy and paste of the expert damages analysis.  Because the work on summary judgment and expert witness preparation should have greatly facilitated preparation of the mediation statement, time spent on it will be reduced by 30 of Yankwitt's hours.

### 3.    *Summary Judgment*

Defendant next argues that the 324.25 hours spent by Plaintiff's counsel combined on Plaintiff's memorandum in opposition to summary judgment is "an egregious example of excessive billing," requesting instead that Plaintiff's counsel only be awarded one third the hours sought.  While Plaintiff's counsel claim that Defendant's counsel spent 319.2 hours on its initial summary judgment papers (Pl.'s Reply Mem. Supp. Appl. at 16), and Defendant's counsel aver that they actually spent 250.4 hours on the initial summary judgment briefing (Mishra Decl. [Doc. # 277] at ¶ 4), the point to be taken is that issues and evidence presented a very complex motion requiring substantial work.  Defendant also cites to the "vast

---

[16] Defendant's argument that time entries submitted by Plaintiff's counsel are vague is addressed below as part of the larger discussion of Defendant's request for an across-the-board hour reduction on account of vague entries.

difference between the work required in moving for summary judgment and opposing such a motion" (Def.'s Sur-reply Mem. Opp. Pl.'s Appl. [Doc. # 276] at 9.)  However, while the work on summary judgment is obviously different given the parties' opposite objectives, the skills, analysis, research, and drafting necessary to hone an effective opposition to summary judgment may well entail significant expenditures of attorney effort equal to or exceeding that of opposing counsel.

Plaintiff's counsel further explain that "Defendant's summary judgment motion raised fourteen separate arguments supported by 159 statements of material fact, requiring a substantial responsive memorandum, a 33 page, 199 paragraph counterstatement of facts, identification and presentation of substantial documentary exhibits, and supporting Declaration and Affidavits." (*Id.*)  However, all three of Plaintiff's counsel spent many hours on the summary judgment briefing, and numerous billing entries are so vague that the Court cannot determine whether their efforts were duplicative.  For instance, on August 27, 2007, Yankwitt billed fourteen hours for "drafting summary judgment brief;" on September 9, 2007, Golub billed 6.5 hours for "[r]esearch[ing] USERRA; prep[ping] Summary Judgment response;" on September 15 and 16, 2007, Golub spent 8 hours "[p]rep[ping] Summary Judgment Opposition;" on September 19 and 20, 2007 Levine spent 6.75 hours "[r]eview[ing] and edit[ing] Summary Judgment Opp;" on September 29, 2007, Golub spent 10 hours "[p]rep[ping] mem Opposition Summary Judgment;" and on October 4, 2007, Golub billed 12 hours for "[p]rep[ping] Opposition to Summary Judgment."  (Billing Schedule at 16–18.)  To account for these entries that suggest duplication of work, the compensable hours spent on summary judgment will be decreased by 30 hours from Yankwitt's time.

28

### 4.   *Paralegal Attendance at trial*

Plaintiff seeks an award covering 72 hours that Jackson spent at trial.  Defendant responds that "counsel's paralegal did not perform any work while sitting idly by in the courtroom," and therefore, Plaintiff's counsel is not entitled to fees for those hours requested.  (Def.'s Mem. Opp. Pl.'s Appl. at 23.)

In contrast, Yankwitt avers that Jackson "took notes of pertinent testimony to assist [P]laintiff's counsel with future examinations, closing arguments, and briefing; coordinated the appearance of witnesses; and assisted [P]laintiff's attorneys with maintaining and presenting [P]laintiff's exhibits throughout trial." (Yankwitt Decl. at ¶ 13.) When paralegals have played active roles during trials, courts have made award that include fees for their time at trial.  *See, e.g.*, *Bonner v. Guccione*, No. 94cv77335(DLC), 1997 WL 441910, * 10 (S.D.N.Y. Aug. 6, 1997) (awarding fees for "work of a paralegal at trial" preparing documents because "the availability of competent support staff ensures that a trial will run smoothly and not burden the court and jury with undue delays"), *vacated on other grounds*, 178 F.3d 581 (2d Cir. 1997); *Dailey v. Societe Generale*, 915 F. Supp. 1315, 1328 (S.D.N.Y. 1996) (awarding fees for time of paralegal during trial who "not only brought research and other needed material to court, but also took notes during important parts of the trial so that the attorneys would have an accurate record on which to base questions at trial and closing arguments," noting that the paralegal fees sought were substantially less than the cost of a daily transcript), *aff'd*, 108 F.3d 451 (2d Cir. 1997).  Because Jackson did not "sit[] idly" as Defendant's counsel suggest, but rather, is represented to have played the supportive role for Plaintiff's counsel during trial, which warrants fees, her hours spent in trial will be awarded in full.

### 5.    *Time Spent on Unsuccessful Claims*

Defendant next calls for an across-the-board reduction in hours sought by Plaintiff's counsel because they were not successful on all of Serricchio's claims.  An award must "exclude . . . hours dedicated to severable unsuccessful claims." *Quaratino*, 166 F.3d at 422. In *Quarnatino* the Second Circuit also held that when unsuccessful and successful claims are "inextricably intertwined" and based on the same facts, district courts have discretion to award the entire fee. *Id.*; *see also Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170 (2d Cir. 1996) ("Where the district court determines that the successful and unsuccessful claims are 'inextricably intertwined' and involve a common core of facts or [are] based on related legal theories, it is not an abuse of discretion for the court to award the entire fee." (internal citations omitted)).

Specifically, Plaintiff's USERRA discrimination and retaliation claims were abandoned, and summary judgment was entered for Defendant on Plaintiff's Connecticut state–law negligence, unjust–enrichment, and unpaid–wage claims.  Those state–law claims are largely predicated on some of the same facts underlying Plaintiff's successful claims.[17] Plaintiff's negligence claim was based on Defendant's handling of his book of business during his absence (Am. Compl. [Doc. # 33] at ¶ D–18), his unjust–enrichment claim was based on the financial benefits Wachovia received from the book of business he took to it and developed (*id.* at ¶ F–21), and his unpaid–wage claim was based on his claim that he was entitled to full unpaid transitional compensation following the termination of his employment (*id.* at ¶ B–22).  Moreover, Serricchio's USERRA discrimination and retaliation

---

[17] Indeed, the state-law claims in the Amended Complaint incorporate the same factual paragraphs as the USERRA reinstatement and constructive discharge claims.  (*See generally*, Am. Compl. [Doc. #  33].)

claims had been predicated on Defendant's actions taken in response to his exercise of rights under USERRA  (Am. Compl. at ¶ 19), which factored into the findings on constructive discharge and willfulness.   While some time spent drafting Plaintiff's Opposition to Summary Judgment on the state–law claims will be reduced, as discussed below, an across-the-board reduction is inappropriate because the facts on which Plaintiff relied to support those claims and his USERRA discrimination and retaliation claims were inextricably intertwined with the facts supporting the USERRA reinstatement and constructive discharge claims on which he prevailed.

Defendant also argues that Plaintiff's counsel should not be awarded fees for time spent amending the complaint to include unsuccessful claims.   Plaintiff's counsel acknowledge this, pointing out that they have not sought reimbursement for the 18.75 hours Attorney Marilyn Ramos spent amending the complaint.  They did, however, include 38.02 hours preparing the Amended Complaint, the Motion to Amend, and the supporting memoranda.  (Pl.'s Reply and Mem. Supp. Appl. at 21 n. 22.)  Because Plaintiff succeeded on none of the claims asserted in the Amended Complaint, and the time spent on it was wholly separable from time spent on successful claims asserted in the original Complaint, the other 38.02 hours spent on the Amended Complaint will not be awarded.

Additionally, Defendant contends that Plaintiff's counsel should not be awarded fees for their attempt to submit a report by Samuel F. Wright as an expert report, because Defendant successfully moved to strike it.  The proper inquiry is not whether Plaintiff's attempt to submit Wright as an expert was successful, but rather whether it was a reasonable litigation strategy. *See Gierlinger v. Gleason*, 160 F.3d 858, 880 (2d Cir. 1998) (successful plaintiff in case brought under 42 U.S.C. § 1983 was entitled to fees for time spent on

unsuccessful appeal of an adverse decision during an earlier stage of litigation because the appeal was reasonably undertaken); *Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 393 (S.D.N.Y. 2000) ("Preventing . . . prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise successful litigation may discourage attorneys from zealously representing their clients and raising novel but reasonable arguments on their behalf."). Wright, who enforced the Veterans' Reemployment Rights law while working for the Department of Labor and has published more than 300 articles and spoken on 500 occasions on veteran reemployment rights (Yankwitt Decl. at ¶ 14), advised Plaintiff's counsel on "the scope of USERRA and its applicability to commission employees returning from active duty." (*Id.*) Nonetheless, the Court determined that

> Mr. Wright—however learned and accomplished—provides little in the way of expertise which is helpful to the jury. Mr. Wright is an attorney with a great deal of experience working with USERRA for the agency charged with enforcing it, and his opinion sets forth a great deal regarding the history and operation of USERRA and its predecessor statute. He brings no experience in either human resources management generally or the securities industry specifically, and therefore does not anchor the section of his report dealing with possible accommodations which could have been offered by the defendants in those fields' expertise. . . . Wright has not provided information which will "help the jury 'to understand the evidence or to determine a fact in issue'" by demonstrating what he alleges to be proper USERRA compliance and then permitting the jury to compare Wright's archetype to the record here . . . but has tendered an entire legal analysis.

(April 4, 2008 Bench Ruling Granting Motion to Strike (internal citations omitted).) Because Wright's opinions were purely legal and lacked the "helpful" expertise required of a trial expert, proffer of him as a trial expert was not reasonable and will not be credited in this award.

Defendant also argues that because Plaintiff's state–law claims were defeated at summary judgment, the time Plaintiff's counsel spent on the summary judgment opposition, defending those claims should not be awarded.  "The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).  "The court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters." *Hensley*, 461 U.S. at 435.  Because the unsuccessful claims were inextricably intertwined with the claims that survived summary judgment, and defense of those claims by Plaintiff's counsel was reasonably undertaken, time spent in opposition to summary judgment will be compensated in full.

### 6.    *Vague Time Entries*

Defendant also calls for an across-the-board reduction in hours by 20 percent for "vague time entries" submitted by Plaintiff's counsel.  Counsel seeking fees are "not required to record in great detail how each minute of [their] time was expended," *Hensley*, 461 U.S. at 437 n.12, but they are obliged "to keep and present records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) (rejecting time records with one description for an entire day's work).  "[C]ounsel should at least identify the general subject matter of his [or her] time expenditures," and in the absence of such identification, a court may refuse to award fees based on those entries. *Electro–Methods, Inc. v. Adolf Meller Co.*, 473 F. Supp. 2d

33

281, 305–06 (D. Conn. 2007) (citing *Rand–Whitney Containerboard v. Town of Montville*, No. 3:96cv413(HBF), 2006 WL 2839236, * 16 (D. Conn. Sept. 5, 2006)).

Courts in this district have reduced fee awards when time entries do not refer to the specific matter worked on; while "preparation for hearing" is a permissible time entry not subject to reduction because it refers to a specific event and allows for a determination of the reasonableness of time spent, "work on various items" and "work on documents" are too vague for a court to determine the reasonableness of time spent. *Electro-Methods,* 473 F. Supp. at 305–06 (reducing award because "work on documents" and "work on various items" was too vague for the court to determine the reasonableness of time spent); *see also Rabin v. Wilson–Coker*, 425 F. Supp. 2d 269, 272–73 (D. Conn. 2006) (reducing the number of hours by five percent because the billing records contained entries such as "work on brief," even though most of the time entries were sufficiently detailed); *Mr. & Mrs. B. v. Weston Bd. of Educ.*, 34 F. Supp. 2d 777, 781 (D. Conn. 1999) ("Entries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter.").

Here, most of the time entries submitted by Plaintiff's counsel do "at least identify the general subject matter" and the hours attributed do not appear excessive.

### 7.    *Administrative Work Performed by Plaintiff's Counsel*

Defendant next argue that administrative and clerical tasks that could have been performed by a paralegal but were performed by Plaintiff's counsel should be awarded at the

paralegal rate.[18]  The problem with Defendant's argument is that it is unclear whether many of the entries referred to by Defendant as reflecting clerical work—"Finalize Complaint; civil cover sheet, appearance, waivers"; "Prep Complaint and forms for filing"; "Prep and file Answer,"; "Review final Rule 26f; email; file Rule26f"; and "Request to Charge; proposed Voir Dire; Prep Exhibits for Trial Mgmt Order"—could have been performed by a paralegal. For instance, "Finalize Complaint" could mean either draft substantive language for the complaint, which is not clerical work, or format the complaint, which is.  Those tasks highlighted by Defendant that are undeniably clerical and could have been performed by a paralegal—"File Rule 26f"; "Prep deposition notices"; "Depo Notices"; and "Deposition scheduling"—totaling 3.75 hours will be awarded at the paralegal rate of $130 per hour.

### 8.    *Congressional Testimony*

Defendant also argues that fees should not be awarded for the 18 hours spent by Yankwitt in connection with Serricchio's testimony on USERRA before a Congressional sub-committee in February 2008.  The Court agrees.  Although Plaintiff's counsel was called by a sub-committee staffer and notified that Wachovia's lobbyists had been speaking with and providing materials to Congressional members to assist them in questioning Serricchio about this case (Yankwitt Decl. at ¶ 17), Serricchio's Congressional testimony was not necessary to this case, and thus, Yankwitt's work supporting his client's decision to testify will be excluded from the fee award.

---

[18] Courts have awarded fees for non-legal tasks performed by attorneys at paralegal rates, *see, e.g., Davis v. New York City Hous. Auth.*, No. 90cv628(RWS) 2002 U.S. Dist. LEXIS 23738 at * 11–12 (S.D.N.Y. Dec. 11, 2002), however, "it would be unreasonable to expect attorneys to delegate every ministerial duty they perform because the time spent delegating the task could well exceed the time spent by the attorney performing the task [him]self," *Marisol A.*, 111 F. Supp. 2d at 395.

9.      *Response to Defendant's Opposition to Fee Application*

Plaintiff's counsel have supplemented their initial application for fees to include the time and costs spent subpoenaing defense counsel's billing records, defending Defendant's Motion to Quash the subpoenas, and preparing their Reply Memorandum.  "A reasonable fee should be awarded for time reasonably spent in preparing and defending an application for . . . fees."  *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999).

Defendant first responds that the time spent on Plaintiff's efforts to subpoena billing records of Defendant's counsel should only be awarded at 50 percent because those records are of extremely limited value.  Plaintiff's counsel used the billing records to compare the overall time they expended on this litigation with the time spent by Defendant's counsel and their relative hourly rates (*see* Pl.'s Reply and Suppl. Appl. at 2–3) and the comparative time spent on summary judgment to support the reasonableness of Plaintiff's counsel's opposition.  In denying Defendant's Motions to Quash Plaintiff's billing records subpoena, the Court explained that "the better approach is to permit discovery of an opponent's billing records and then, in comparing the work performed by each side's attorneys, regard differences in the parties' burdens and incentives as relevant to the weight of the records, not whether the records are discoverable."  *Serricchio v. Wachovia Secs., LLC*, 258 F.R.D. 43, 44–45 (D. Conn. 2009) ("*Serricchio III*").

Because Plaintiff's counsel acted reasonably in subpoenaing Defendant's counsel's billing records without regard to their degree of reliance on them, the hours related to subpoenaing billing records of Defendant's counsel will not be reduced.

Defendant next argues that the hours expended by Plaintiff's counsel drafting their overlength Reply Memorandum [Doc. # 275] should be reduced by 50 percent because it was

36

an "unwarranted endeavor," taken "without prior approval from the Court," and was unnecessary. (Def.'s Sur-Reply at 19.)  While Plaintiff's memorandum was longer than the ten pages allowed under Local Rule 7(d) in the absence of the court's approval, the Court did grant Plaintiff leave to file excess pages *nunc pro tunc* [Doc. # 273]; therefore, time spent drafting the Reply Memorandum was not unnecessary and will not be reduced.

   C.  Costs

   Awardable costs include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (internal citations omitted).  Defendant challenges requests for reimbursement for litigation expenses by Plaintiff's counsel on five grounds.

   Defendant first argues that it should not be required to pay Plaintiff's share of the private JAMS mediation ($6,152.20) because it was entirely voluntary and undertaken to avoid future litigation.  However, Yankwitt avers, and Defendant does not dispute, that the parties used private mediation because Defendant declined to agree to the mediation directed by the Court before an attorney on the District's special masters list. (Yankwitt Decl. at ¶ 12.)  The Court sees no reason why Plaintiff's costs associated with the JAMS mediation should not be included in the scope of this award.

   Defendant next argues that Plaintiff's counsel are not entitled to the costs for transcripts of the "unnecessary depositions" of Bernard, Potter, Keniston–Lazar, and Rotondo.  As discussed above, those depositions were of witnesses who were designated as Federal Rule of Civil Procedure 30(b)(6) witness, were not unnecessary, and therefore the costs of producing transcripts were reasonably incurred and will be included in this award.

   Defendant argues that Plaintiff's counsel are not entitled to costs for retaining

Samuel Wright ($4,000) because the Court granted Wachovia's motion to strike his report. Given Wright's lack of expertise in human resources and the purely legal analysis provided in his report, his retention for trial purposes was not reasonable and the Court does not understand Plaintiff to be claiming his retention for other purposes. Therefore, the Wright retention will not be compensated.

Defendant also argues that Plaintiff's counsel are not entitled to compensation for Yankwitt's travel to Washington, D.C. for Serricchio's Congressional testimony. Because the testimony was not necessary to this litigation, Plaintiff's counsel is not entitled to the $1,239.20 expended in connection with that trip.

Defendant next argues that Plaintiff's counsel are not entitled to photocopying expenses at the rate of $0.25 per page they seek for 51,282 copies; rather, Defendant argues that $0.15 per page is reasonable. Copying costs are recoverable "and should be reimbursed at a rate no higher than would be charged by a commercial vendor." *See King Vision Pay–Per–View Corp. v. Tardes Calenas Moscoro, Inc.*, No. 01cv9775(JGK)(JCF), 2004 WL 473306, at * 5 (S.D.N.Y. March 12, 2004). Because the request for disbursements provided by Plaintiff's counsel (Ex. B. to Golub Decl. at 2) does not include any commercial vendor invoices, the Court will assume they copying was done in–house and will be reimbursed at $0.15 per page, for a total of $7,692.30 (a reduction of $5,128.20). *See Rand–Whitney*, 2006 WL 2839236 at * 25.

Finally, Defendant claims that Plaintiff's counsel are not entitled to the costs associated with serving the subpoenas for billing records. As discussed above, Plaintiff's counsel acted reasonably in serving subpoenas for billing records, and the costs of service of the subpoenas will not be exempted from the award.

D.    Summary

The rates used in calculating attorneys fees are $465 per hour for Golub, $410 per hour for Levine, $300 per hour for Yankwitt, and $130 per hour for Jackson. The hours for which Plaintiff's counsel seek compensation are reduced as follows:

- Yankwitt's hours are reduced by 30 on the Mediation Statement; 30 for his work on summary judgment briefing; 23.75 for his work related to the Samuel Wright report; 16 for work related to Serricchio's Congressional testimony; and 3.5 for clerical tasks that could have been performed by a paralegal. Yankwitt's hours are therefore reduced by a total of 103.25 hours to 1,131.59 hours.

- Levine's hours are reduced by 22.69 for time spent on the Amended Complaint and by 0.25 hours for filing the 26(f) report, which could have been done by Jackson. Levine's hours are therefore reduced by a total of 22.94 hours to 154.47.

- Golub's hours are reduced by 15.34 hours for his work on the Amended Complaint and 18.45 hours for his work related to the Wright report. Golub's hours are therefore reduced by a total of 33.79 hours to 644.17.

- 3.75 additional hours are credited at Jackson's rate, for tasks performed by Yankwitt and Levine that she could have properly handled.

Finally, the costs sought are reduced by $4,000 for the Wright report, $1,239.20 for Yankwitt's travel costs to Washington, D.C., and $5,128.20 to reflect the $0.15 copying rate, for a total cost reduction of $10,367.40. Thus, the fee award is as follows:

| Attorney | Hours | Rate | Total |
|----------|-------|------|-------|
| Yankwitt: | 1,131.59 | $300/hr | $339,477.00 |
| Levine: | 154.47 | $410/hr | $63,327.70 |
| Golub: | 644.17 | $465/hr | $299,539.05 |
| Sub-total: | | | $702,343.75 |
| | | | |
| Jackson: | 147.75 | $130/hr | $19,075.50 |
| Costs: | | | $108,687.96 |
| | | | |
| Total Fee and Cost award: | | | $830,107.21 |

IV.    Conclusion

For the reasons set forth above, Defendant's Motions for Judgment as a Matter of Law [Doc. # 233] and for a New Trial [Doc. # 237] are DENIED.  Plaintiff's Motion for Attorneys Fees [Doc. # 243] and Supplemental Motion for Attorneys Fees [Doc. # 267] are GRANTED.    The Court awards Plaintiff $36,567.98 in prejudgment interest, and $830,107.21 in attorneys fees and costs.

The Clerk is directed to issue a Final Judgment in the amount of $1,645,581.19.


IT IS SO ORDERED.


    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this ___ day of March, 2010.

40